**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

FINGERHUT BUSINESS SERVICES, INC., Civil No. 01-1261 (JEL/JGL)

Plaintiff,

vs.

**ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

WAL-MART.COM, INC.,

Defendant.

---

EDWARD M. LAINE, Minneapolis, Minnesota, and GINA M. GROTHE, Minnetonka, Minnesota, appeared on behalf of Plaintiff Fingerhut Business Services, Inc.

PERRY M. WILSON III, Minneapolis, Minnesota, appeared on behalf of Defendant Wal-Mart.com, Inc.

---

This is a breach of contract case. Plaintiff Fingerhut Business Services, Inc. ("Fingerhut") alleges that Defendant Wal-Mart.com, Inc. ("Wal-Mart") failed to make certain payments to Fingerhut pursuant to a contract between those parties. Wal-Mart argues that the terms of the contract in question did not require Wal-Mart to make those payments to Fingerhut. Wal-Mart also argues that the amount Fingerhut claims is due under the contract is so disproportionate to Fingerhut's actual damages as to be unenforceable as a matter of law. Fingerhut moved for summary judgment as to both liability and damages. Summary judgment is appropriate if no genuine issue of material fact exists and if the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). For the reasons stated in this Order, the Court will deny Fingerhut's motion in its entirety.

In early 1999, both Fingerhut and Wal-Mart were seeking ways to take advantage of the marketing potential of the Internet. Fingerhut had established a facility in Utah which was

FILED DEC 0 9 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

capable of processing orders, managing inventory, and otherwise providing support for Internet retailers, and Wal-Mart was preparing to launch an Internet web site through which Wal-Mart intended to market its products directly to consumers. On May 31, 1999, Fingerhut and Wal-Mart agreed that Fingerhut would provide order fulfillment services for Wal-Mart's Internet business[1]. Fingerhut and Wal-Mart each anticipated that Wal-Mart's Internet business would generate a high volume of orders, and Fingerhut's compensation under the May 31, 1999, agreement was based primarily upon the number of orders Fingerhut processed for Wal-Mart.

The actual number of orders Fingerhut processed for Wal-Mart over the next several months, however, did not meet the parties' expectations, and Fingerhut eventually had problems covering its fixed costs associated with the Wal-Mart agreement. Fingerhut began negotiations to revise its agreement with Wal-Mart in September 1999. One of Fingerhut's objectives in those negotiations was to stabilize its cash flow through obtaining some form of guaranteed minimum monthly payment from Wal-Mart. The parties differ in their recollections of the negotiations concerning these minimum monthly payments. Gary Bledsoe, who was involved in the negotiations on behalf of Fingerhut, states in his affidavit that the parties "understood that some sort of price increase or minimum payment to [Fingerhut] was required," Bledsoe Aff. ¶ 8, and that the parties intended Wal-Mart's monthly business forecast for the first year of the revised contract term to set Wal-Mart's minimum "floor for performance" for the entire term of the Contract. (Bledsoe Aff. ¶ 13.) Michael Kraemer, who was involved in the negotiations on Wal-Mart's side, states in his affidavit that Wal-Mart "would never have agreed to use [its] forecast ... for more than one year," Kraemer Aff. ¶ 8, and that any annual forecast "became irrelevant" when that forecast expired. (Id.)

In August 2000, Fingerhut and Wal-Mart executed a revised fulfillment services agreement. (Bledsoe Aff. Ex. E, hereinafter "the Contract.") The Contract had an effective date

---

[1] A copy of this agreement is not in the record. Affidavit testimony in the record from both parties, however, outlines the basic terms of that agreement.

of June 1, 2000, and was to continue in effect until January 31, 2002, unless "otherwise terminated earlier pursuant to the terms and conditions" of the Contract. ( Id. § 5(a).) The Contract provides, inter alia, that Wal-Mart will make monthly payments to Fingerhut and that those monthly payments will include a "Minimum Services Fee." ( Id. § 2(b).) The Contract includes two complex formulas for calculating the Minimum Services Fee for a particular month. ( Id. Schedule A at 7[2].) The first formula is based on the number of stock keeping units in inventory, and the second is based on Wal-Mart's forecasted business volume. (Id. at 7-8.) Although Wal-Mart must pay "the greater" of the results of the two formulas each month as the Minimum Services Fee, id., the parties agree that the second formula, which is based on Wal-Mart's business forecasts, is the only method of calculation applicable to this dispute.

Determining whether Wal-Mart must pay a Minimum Services Fee under the second formula involves a comparison between several business forecasts and the number of packages Fingerhut shipped for Wal-Mart. According to the Contract, Wal-Mart must pay a Minimum Services Fee if the number of packages Fingerhut shipped for Wal-Mart in a given month was "less than the Forecast Package Volume" for that month. ( Id. at 8.) The Contract specifically defines "Forecast Package Volume" as

> the greater of the (a) number of packages estimated to be shipped as set forth in the monthly forecast submitted by [Wal-Mart] to [Fingerhut] three (3) months immediately prior to the commencement of the subject month or (b) the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by [Wal-Mart] upon execution of this Agreement and attached hereto or (c) with respect to each year after the expiration of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by [Wal-Mart] in the month of March prior to commencement of the following one-year period under the Agreement.

(Id. at 8-9.) As indicated in part (b) of the "Forecast Package Volume" definition, the Contract includes a page entitled "Annual Forecast of Estimated Number of Parcels to be Shipped." Id. at 11. Wal-Mart's business plan, which is attached to the Contract, refers to an "attached forecast

---

[2] Schedule A of the Contract is paginated separately from the body of the document and contains no section numbers. All citations to Schedule A in this Order refer to the internal pagination of Schedule A.

covering the period of June 2000 - May 2001." (Id. Schedule B.) The "Annual Forecast" document itself, however, lists the months of the year running from June through May along with a number of parcels for each month but without reference to a particular year. (Id. Schedule A at 11.)

Determining the amount of the Minimum Services Fee involves a similarly complex calculation. If a Minimum Services Fee is due under the second formula, that fee is "an amount equal to the Minimum Packages ... multiplied by the Package Fee." (Id. at 8.) The Contract defines "Minimum Packages" as "an amount equal to the difference between 75% of the Forecast Package Volume ... and the actual number of packages shipped during the month." ( Id.) The "Package Fee" is equal to the "Package Fulfillment Fee," which the Contract sets at "$3.32 per single unit package and $.88 per each additional unit per package," id. at 3, multiplied by the "actual average number of items per package shipped during the month." (Id. at 8.)

A few months after signing the Contract, Wal-Mart determined that it wanted to end its relationship with Fingerhut and to obtain order fulfillment services elsewhere. Wal-Mart notified Fingerhut of that decision in January 2001. In March 2001, Wal-Mart submitted a business forecast to Fingerhut indicating that Wal-Mart would ship zero packages through Fingerhut for the last six months of the term of the Contract, from August 2001 through January 2002. Fingerhut in fact fulfilled no orders for Wal-Mart for that six month period, and Wal-Mart did not pay Fingerhut a Minimum Services Fee for any of those six months.

Fingerhut commenced this action in July 2001, taking the position that Wal-Mart breached the Contract because Wal-Mart did not pay Fingerhut a Minimum Services Fee for the last six months of the Contract's term. As Fingerhut reads the Contract, the phrase "the subject month" in the definition of "Forecast Package Volume" refers only to a month of the year, such as "August," without reference to a particular year. That reading, according to Fingerhut, requires Wal-Mart to pay Fingerhut a Minimum Services Fee for the months of August 2001 through January 2002 because the number of parcels for the months of August through January listed in the "Annual Forecast" attached to the Contract is greater than the number of parcels

Wal-Mart forecasted for August through January in March 2001, and the Contract defines the "Forecast Package Volume," and thus the basis for determining the Minimum Services Fee, as the greater of those two forecasts. Wal-Mart, on the other hand, reads the phrase "the subject month" as referring to a month of a particular year, such as "August 2001." If the "Annual Forecast" attached to the Contract ends in May 2001, as Wal-Mart contends, the forecast Wal-Mart submitted in March 2001 supersedes the forecast attached to the Contract, part (b) of the "Forecast Package Volume" definition is inapplicable after the first year of the Contract's term, and the "Forecast Package Volume" must be based on Wal-Mart's forecast of zero packages for the last six months of the Contract term. Furthermore, according to Wal-Mart, even if Fingerhut's position with respect to "the subject month" is correct, Wal-Mart would owe no Minimum Services Fee because Fingerhut shipped no packages during the final six months of the Contract term, and a fee determined through multiplying any amount by the "actual number of packages" Fingerhut shipped necessarily is zero.

The parties agree that the law of New York governs the interpretation of the Contract. (Id. § 21(g)). Under New York law, the court determines as a threshold matter whether the terms of a contract are ambiguous. Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998). "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Id. (citation and internal quotation marks omitted). If the contract is ambiguous and extrinsic evidence of the parties' intent exists, evaluating that evidence typically presents a question of fact and precludes summary judgment. Scholastic, Inc. v. Harris, 259 F.3d 73, 83 (2d Cir. 2001). The court should resolve the ambiguity as a matter of law only in the "rare case," id., in which the extrinsic evidence allows a reasonable factfinder to reach only one conclusion as to the contract's meaning.

The Court finds that the Minimum Services Fee provisions of the Contract are ambiguous. Fingerhut's interpretation of the Contract is predicated on the assumption that clause

(b) of the "Forecast Package Volume" definition is meaningless unless the numbers listed in Wal-Mart's "Annual Forecast" extend to months beyond the first year of the Contract's term. Although Fingerhut's interpretation is plausible, Schedule B of the Contract implies that the "Annual Forecast" extends only through May 2001, and the phrase "the subject month" in the "Forecast Package Volume" definition could be read to support Wal-Mart's interpretation of the Contract as well as Fingerhut's. Given the conflicting extrinsic evidence, whether the parties intended Wal-Mart's March 2001 forecast to supersede the forecast attached to the Contract for purposes of calculating the Minimum Services Fee is a question for the finder of fact.

The same is true for the question of Fingerhut's damages. New York law implies a covenant of good faith and fair dealing in every contract. Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995). This covenant includes a duty not to act arbitrarily or irrationally in exercising any discretion allowed under the contract. Id. Fingerhut's compensation under the Contract is based on Wal-Mart's performance, and Wal-Mart cannot arbitrarily refuse to perform in order to deny Fingerhut compensation to which Fingerhut otherwise would be entitled. Wal-Mart is correct, however, in asserting that Fingerhut may not be entitled to the amount of damages Fingerhut claims in its motion papers even if Wal-Mart breached the Contract, and the Court will reserve ruling on Wal-Mart's arguments with respect to damages until Fingerhut's actual losses, if any, are established at trial.

For the foregoing reasons, **IT IS HEREBY ORDERED THAT** Fingerhut's motion for summary judgment is DENIED in all respects.

Dated: December 9, 2002

JOAN ERICKSEN LANCANSTER, District Judge
United States District Court