**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Fingerhut Business Services, Inc.,<br>Plaintiff,<br>v.<br>Wal-Mart.com, Inc.,<br>Defendant. | Case No: 01-cv-1261 (JNE/JSM)<br><br>**PLAINTIFF FINGERHUT BUSINESS SYSTEMS, INC.'S TRIAL MEMORANDUM** |

## I. INTRODUCTION AND SUMMARY.

Plaintiff Fingerhut Business Systems, Inc. ("Fingerhut")[1] submits this Trial Memorandum to outline the facts expected to be proven, together with the applicable law.

This case arises out of a contract between Wal-Mart.com, Inc. ("Wal-Mart") and Fingerhut to perform fulfillment services for Wal-Mart's Internet shopping business from June 1, 2000, to January 31, 2002 (the "Fulfillment Services Agreement," or "FSA"). Fingerhut's fulfillment services to Wal-Mart included the receiving and storing of Wal-Mart merchandise, integrating this inventory into a computerized Fingerhut Logistics System, and packaging, labeling and shipping Wal-Mart merchandise as orders came in via the Internet. Fingerhut also provided customer service, computer systems support and management support to Wal-Mart under the FSA. The FSA could only be terminated for cause, defined as a material breach,

1 Fingerhut Business Services, Incorporated, was the originally named plaintiff in this matter. However, though a series of corporate transactions, Federated Corporate Services, Incorporated, a subsidiary of Federated Department Stores, obtained the assets and liabilities of Fingerhut Business Services, Incorporated, including this lawsuit. The parties have stipulated to substituting Federated as the real party in interest, which will be filed with the Court prior to the trial date.

during its Term. Here, Wal-Mart chose to abandon its contractual obligations early, and it is understood that it had no cause to do so.

The pricing negotiated by the parties for performing its services is set forth in the FSA, and in the Schedule A attached thereto.[2] In addition to Services Fees, the FSA and Schedule A provide for the payment of Monthly Service Fees in any month that actual shipment fell below certain forecasted volumes. The Minimum Services Fee is calculated using the greater of one of three forecasts: (a) a rolling three-month forecast, or (b) the annual forecast appended to the FSA at Schedule A, or (c) the annual forecast, if any, submitted for any successive renewal years.

In general, the Minimum Services Fee operates on a sliding scale. No Minimum Services Fee is charged in those months where Wal-Mart's actual shipping volumes meet or exceed its forecasted volumes. Conversely, the Minimum Services Fee becomes progressively larger in direct proportion to the amount of shortfall between Wal-Mart's projected forecasts and its actual package volumes. Fingerhut will prove that the purpose of the Minimum Services Fee was to provide adequate compensation for making available the capacity to handle Wal-Mart's fulfillment needs, including the fixed costs associated with providing that capacity, during any month that order volume would not result in sufficient Service Fee compensation.

Both parties performed under the FSA from June 2000 through January 2001. However, in January 2001, Wal-Mart informed Fingerhut that it intended to transfer its business to a new distribution center of its own, located in Carrollton, Georgia by August of that year. No

---

[2] Fingerhut and Wal-Mart's parent, Wal-Mart Stores, Inc., were subject to an earlier agreement to provide fulfillment services, dated May 31, 1999 (the "Original Agreement"). Fingerhut's compensation under the Original Agreement derived in a large part from the processing or fulfilling of a sufficient volume of Wal-Mart's orders. The Original Agreement resulted in substantial losses to Fingerhut because of Wal-Mart's low package volumes. Thereafter, the parties entered into negotiations which culminated in the Fulfillment Services Agreement that is the subject of this lawsuit.

contemplation was made that there was cause for early termination. Fingerhut reminded Wal-Mart of its contractual obligation to pay Fingerhut a Minimum Services Fee for any month its actual volumes fell short of forecasted volumes, as set forth in the FSA.

When Wal-Mart later submitted its 2001-2002 Annual Forecast, as required under the FSA, it manufactured its main liability defense by forecasting that it would ship "0" packages through Fingerhut's facility from August 2001 through January 2002. Wal-Mart then pulled all of its inventory from Fingerhut's distribution center in August 2001. Despite the lack of cause to terminate early, Wal-Mart refused to pay Fingerhut a Minimum Services Fee for July 2001[3] through January 2002, as required by the FSA.

## II. FACTS TO BE PROVEN AT TRIAL.

Fingerhut submits that, as a matter of law, the FSA is properly interpreted to require Wal-Mart to pay a Minimum Services Fee for each of the months of July 2001 through January 2002. This conclusion is fortified by the application of New York[4] principles governing the interpretation of contracts which: require a practical interpretation giving effect to reasonable expectations; avoids an interpretation which renders terms of an agreement meaningless; and imposes a covenant of good faith and fair dealing. The total Minimum Services Fee, under the terms of the FSA, is $3,196,813. Further, as a matter of law, the Minimum Services Fee provision is not, as Wal-Mart contends, a liquidated damages clause which is void as a penalty. Of course, because Fingerhut's motion for summary judgment was denied, Fingerhut will

---

3 Although Wal-Mart shipped some packages from Fingerhut in July 2001, its actual package volume did not meet the forecasted volume, thus triggering the Minimum Services Fee for July 2001.

4 Section 21(g) of the FSA provides that New York law governs issues of construction, interpretation and performance of the FSA.

compliment the four corners of the FSA with appropriate extrinsic evidence.[5] The extrinsic evidence will only serve to fortify Fingerhut's claims.

**A. The Original Agreement Between Wal-Mart and Fingerhut Failed to Adequately Compensate Fingerhut for Services Rendered, Thereby Necessitating a New Fulfillment Services Agreement, Culminating in the FSA Which Provides for Minimum Services Fees.**

Prior to the FSA, Wal-Mart and Fingerhut were bound by an earlier Fulfillment Services Agreement, dated May 31, 1999 ("Original Agreement"). Pursuant to the terms of the Original Agreement, Fingerhut was obligated to provide fulfillment services for Wal-Mart's Internet shopping business out of its state-of-the-art Western Distribution Center in Spanish Fork, Utah.

The parties negotiated the terms of the Original Agreement based upon Wal-Mart's assumptions and forecasts as to, among other things, the number of products to be held in inventory by Fingerhut, the volume of shipments to be made, and the estimated number of packages per shipment. Under the Original Agreement, although Fingerhut was paid to store Wal-Mart's inventory, Fingerhut's ability to cover its costs, and hopefully even earn a profit, was largely dependent upon processing a sufficient volume of Wal-Mart's orders. In other words, Fingerhut's ability to plan for and cover its costs depended upon Wal-Mart's communication of accurate forecasts and sufficient actual package shipping volume.

By Fall 1999, concerns developed that aspects of Wal-Mart's projections would not be attained. Wal-Mart began to experience low sales volumes, and yet Wal-Mart wanted Fingerhut to carry a higher number of SKU's (stock keeping units) in inventory. This resulted in increased cost to Fingerhut to store Wal-Mart's items with minimal opportunity for return on investment,

5 Respectfully, Fingerhut wishes to make clear that, in so doing, it is not expanding the case to a trial which includes extrinsic evidence by consent or otherwise waiving its claim that, under the terms of the FSA as written, it is entitled to the claimed amount of Minimum Services Fees as a matter of law.

and a limitation on its ability to seek other third parties with whom to enter into a fulfillment services agreement. In sum, Fingerhut's costs were increasing at the same time as its ability to recoup those costs was diminishing. As a result, Fingerhut sustained substantial losses under the Original Agreement.

In September 1999, Fingerhut approached Wal-Mart with a request that the contract provisions be adjusted to reflect true business metrics, based upon actual results and experience.[6] Wal-Mart persuaded Fingerhut to postpone amending the Original Agreement until after the holiday season, and after Wal-Mart's re-launch of its website in January 2000. Throughout this time, Wal-Mart continued to operate well below projected sales forecasts, and Fingerhut continued to sustain substantial economic losses.

Faced with the reality that the Original Agreement simply was not workable, Fingerhut and Wal-Mart began negotiating revisions to the contract in Spring 2000, to take into account what they had learned about Wal-Mart's business and its projections. Throughout these lengthy negotiations, Fingerhut continually communicated its need for some sort of guarantee, minimum payment or other mechanism in order to generate revenue so that Fingerhut could cover its costs and hopefully make a profit. Fingerhut proposed guaranteed order minimums, a flat rate monthly assessment fee, tiered pricing, and other mechanisms for securing monthly income from Wal-Mart to cover its capital costs during the term of the agreement. Ultimately, the parties

---

6 As a matter of historical perspective, in 1999, Wal-Mart.com was a new business venture initiated by Wal-Mart Stores to enter into the relatively new market of Internet retailing. As such, Wal-Mart had no historical basis upon which to establish accurate volume shipping levels, and had no metrics for gauging actual versus hypothetical costs. At the same time that Wal-Mart.com established its business, Fingerhut Corporation established Fingerhut Business Services, Inc., in order to provide fulfillment services to third party direct to consumer operations such as Wal-Mart.

agreed on a Minimum Services Fee which would be triggered during months orders fell below defined levels.

Wal-Mart and Fingerhut exchanged several drafts of the new agreement, and engaged in lengthy discussions regarding the language of Schedule A, including the Minimum Services Fee. One of these provisions included a defined contract term of 19 months. Wal-Mart requested that the Initial Term of the FSA be extended from 12 months to 19 months, because it foresaw that it would be able to handle most, if not all, of its fulfillment services by January 2002, but wanted Fingerhut to handle Wal-Mart's fulfillment services needs through the 2001 holiday season. Wal-Mart and Fingerhut also agreed that the contract could be terminated by either party only for cause, and that the agreement was automatically renewable for additional one-year terms in the absence of 90-days' notice.

**B. The Newly Negotiated FSA Included a Minimum Services Fee Provision to Compensate Fingerhut for Dedicating the Capacity to Handle Wal-Mart's Needs.**

In August 2000, the parties executed the new Fulfillment Services Agreement (the "FSA"), with an effective date of June 1, 2000. Schedule A of the FSA delineates the various fulfillment and account management services Fingerhut intended to provide to Wal-Mart, and specific fees relating to each service. Schedule A is broken down into 3 categories: Fulfillment Services, Account Management Fees, and Minimum Services Fees. Fulfillment Services included computer set up, order management, customer service, product storage, receiving, package fulfillment, postage, assessments, reporting, and special work requests. Fingerhut's invoices to Wal-Mart reflect the substantial amount of Fulfillment Services Fingerhut performed for Wal-Mart, and the corresponding fees for its extensive services.[7]

[7] Wal-Mart also agreed to pay an Account Management Fee of $7,500 per month to compensate Fingerhut for time devoted to Wal-Mart's account by Fingerhut's Account

The Minimum Services Fee is the second major component of Schedule A, and is read in conjunction with the Fulfillment Services Fee. Computation of the Minimum Services Fee is set forth in detail *infra* at Part II.E and Part III.C. However, the language of the Minimum Services Fee makes clear that it applies only in those months when actual package volumes fail to meet predetermined forecasts submitted to Fingerhut by Wal-Mart. The Minimum Services Fee was expressly negotiated to compensate Fingerhut for its costs in the event that Wal-Mart's actual order volume generated insufficient Services Fees. Notably, Fingerhut was required to reserve a large amount of warehouse space to store Wal-Mart merchandise throughout the entire year, and, even though Wal-Mart may have only required 25-30% of that total capacity in slow months, Wal-Mart's inventories would consume as much as 80% of capacity in the Fall.[8] The Minimum Services Fee in essence acted as a stop-gap to relieve the financial strain on Fingerhut in the event Wal-Mart's actual package volumes failed to generate sufficient Services Fees, in direct response to the pricing and volume issues under the Original Agreement.

### C. Prior to the End of the Initial Term of the FSA, and Without Just Cause, Wal-Mart Made a Calculated Business Decision to Cease Using Fingerhut's Fulfillment Services.

Following a presentation to its board of directors, in January 2001, Wal-Mart informed Fingerhut that, before expiration of the Initial Term of the FSA, it would cease using Fingerhut's fulfillment services. At that time, Wal-Mart stated an intent to transfer much of its business to a new distribution center of its own in Georgia. Fingerhut reminded Wal-Mart of its obligation to

---

*continued*

Manager, and other operational and customer support required to oversee day-to-day operations.

8 Retail businesses like Wal-Mart typically do not generate substantial sales in the first two to three quarters of a calendar year, but make up their shortfall in the fall and winter, during the holiday season. Correlatively, Fingerhut incurred substantial losses in the first two quarters of the calendar year under the FSA, which it hoped to recoup in the last two quarters.

continue to pay monthly Minimum Services Fees pursuant to the FSA for the balance of its term. While mindful of its exposure, Wal-Mart followed through on its announced plans.

Desperate for a liability defense, Wal-Mart later supplied Fingerhut with a minimum package volume forecast of "0" for each of the remaining months of the term of the FSA. Thereafter, Wal-Mart refused to ship even one package through Fingerhut.

**D. The Provisions of the FSA Do Not Allow Wal-Mart to Unilaterally Terminate the FSA Without Cause, Simply by Forecasting "0" Shipping Volumes.**

Wal-Mart's purported defenses emanate from its decision to abandon its contractual obligations. However, the provisions of the Fulfillment Services Agreement expressly prohibit Wal-Mart from walking away from the FSA, without any legal consequence at all, simply by forecasting that "zero" packages will be fulfilled through Fingerhut's distribution center.

First, the Agreement specifically states that Wal-Mart and Fingerhut intend to be bound by the terms of the FSA from June 1, 2000, through January 2002. The Agreement provides for automatically renewable terms, absent 90-days' written notice. During any Term of the FSA, the FSA contemplates that Fingerhut will provide, and Wal-Mart will utilize and pay for, fulfillment services. During any Term, the FSA may be terminated only upon contractually specified grounds.[9]

Wal-Mart also specifically requested that the Initial Term of the FSA extend from 12 months to 19 months (through January 31, 2002), and agreed that Wal-Mart shall pay Fingerhut a Services Fee and a Minimum Services Fee, if applicable, for each month of the Initial Term

---

[9] Grounds for termination prior to expiration are set forth in Section 5(b) and (c). The FSA may be terminated under Section 5(b) if there is a failure to perform a material term or condition of the FSA, notice has been given, and there has been a failure to cure. Under Section 5(c), the FSA is terminated immediately upon a voluntary or involuntary filing of a petition for bankruptcy. It is undisputed that grounds for early termination are not present on the facts here.

after the Effective Date. To address the possibility that changed circumstances might affect the pricing of fulfillment services following the first year of the Initial Term, Wal-Mart and Fingerhut included a "meet and confer" provision in the FSA to act as a safety valve. This provision contemplates that the parties may mutually agree to increase or decrease pricing for the remainder of the Initial Term, depending on the parties' respective costs and circumstances.[10]

Additional provisions of the FSA further cement the conclusion that the obligations of the parties continue throughout the Term of the Agreement. Section 4(a) of the FSA states that "...[Wal-Mart] represents that it desires to conduct its internet direct to consumer business in accordance with the specifications set forth on Schedule B," and further provides that prices are contingent upon this Schedule. Schedule B sets forth a listing of over 38 products (not zero products), it describes the receipts as 20% pallets/80% cases (not zero receipts), and an average number of units per parcel for packages shipped to Wal-Mart customers that more than exceeds zero units.

In sum, several provisions of the FSA make unmistakably clear that Wal-Mart was obligated to use Fingerhut's fulfillment services for the entire Initial Term of the FSA and pay Services Fees thereafter, including the Minimum Services Fee. The FSA does not allow Wal-Mart to walk away from the FSA without legal recourse, simply by forecasting that "zero" packages would be fulfilled through Fingerhut.

---

10 Wal-Mart made no attempt to either schedule a meet and confer or otherwise renegotiate prices after the first year. Rather, prior to the conclusion of the first year, Wal-Mart advised Fingerhut that it intended to vacate the Utah facility prior to the end of the Initial Term.

**E. The Fulfillment Services Agreement and Schedule A Obligate Wal-Mart to Pay Fingerhut the Maximum Minimum Services Fee from August 2001 Through January 2002, Because Wal-Mart Fully Deprived Fingerhut of the Opportunity to Earn Services Fees.[11]**

While Fingerhut receives a portion of fees for receiving and storing Wal-Mart's products, compensation necessary to allow Fingerhut to cover its costs and hopefully earn a profit is dependent upon a sufficient volume of customer orders which allows Fingerhut to earn compensation for processing those orders, and wrapping and shipping the packages (*e.g.*, Fulfillment Services Fees). In those months that Wal-Mart's fulfillment services do not meet projected levels, due to smaller numbers of actual package volumes, the Minimum Services Fee kicks in to make up the shortfall. When this happens, Schedule A requires Wal-Mart to pay "the greater of" two Minimum Services Fees. Wal-Mart and Fingerhut do not dispute that the second circumstance for calculating the Minimum Services Fee applies to the present dispute. The pertinent provisions in Schedule A provide that

> In the event the number of packages shipped in the month by Fingerhut for Company is less than the Forecast Package Volume (as that term is defined below), Company shall pay a Minimum Services Fee in an amount equal to the Minimum Packages (as that term is defined below) multiplied by the Package Fee (as that term is defined above). The term "Minimum Packages" shall be an amount equal to the difference between 75% of the Forecast Package Volume (as that term is defined below) and the actual number of packages shipped during the month.

Under the foregoing language, a Minimum Services Fee is to be paid when packages shipped in the month is less than Forecast Package Volume, a defined term. Schedule A defines Forecast Package Volume as the "greater of" three forecasts submitted by Wal-Mart. Specifically,

[11] Again, Wal-Mart is required to pay the Minimum Services Fee in July 2001 as well, when its actual package volumes failed to meet or exceed projected volumes. However, while Wal-Mart's obligation to pay for July 2001 is based on identical legal and factual principles as the remaining months, the analysis varies slightly in that Wal-Mart did not ship "zero" packages in July 2001.

> The term "Forecast Package Volume" shall mean the greater of the (a) number of packages estimated to be shipped as set forth in the monthly forecasts submitted by Company to Fingerhut three (3) months immediately prior to the commencement of the subject month or (b) the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company upon execution of this Agreement and attached hereto or (c) with respect to each year after the expiration of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company in the month of March prior to commencement of the following one-year period under the Agreement.

Thus, if the minimum packages shipped in any month is less than the "greater of" any of the foregoing three forecasts, Wal-Mart is to pay a Minimum Services Fee. These provisions, taken together with the provisions set forth in Part II.D above, clearly reflect Wal-Mart's understanding that it was required to pay a Minimum Services Fee for each month of the Initial Term, regardless of actual package volumes.[12]

Here, Wal-Mart attempted to sidestep its contractual obligation to use Fingerhut's fulfillment services through January 2002 by submitting an annual forecast of "0" from August 2001 through January 2002. In an after-the-fact attempt to justify its decision, Wal-Mart now argues that subsection (b) above "drops out" after May 2001, and that no Minimum Services Fee is owing. This is contrary to the express language of the FSA; the intent of the parties when they entered into the FSA; and principles of New York law.

## III. SUMMARY OF LEGAL PRINCIPLES.

### A. Wal-Mart Anticipatorily Breached the FSA, Thereby Relieving Fingerhut from Performing the Fulfillment Services Agreement After July 2001.

By unequivocally communicating in early 2001 that it would pull its inventory from Fingerhut's distribution center in August 2001; that it would refuse to use Fingerhut for its

[12] Section 21(i) reinforces this conclusion, stating that the parties agree that they have been provided the opportunity for counsel and accountants to review the terms of the Fulfillment Services Agreement prior to its execution, and no ambiguity should be construed against the party who offered any particular language.

fulfillment services after July 2001; and that it would refuse to pay Fingerhut a Minimum Services Fee after June 2001, Wal-Mart anticipatorily breached the FSA. An anticipatory breach of a contract occurs when a party indicates, through a definite and final communication, prior to the termination of the contract, that it will not continue to perform the contract. *See Rachmani Corp. v. 9 East 96th Street Apt. Corp.*, 211 A.D.2d 262, 266-267, 629 N.Y.S.2d 382 (N.Y. App. Div. 1995). When Wal-Mart repudiated the FSA and caused an anticipatory breach thereof, Fingerhut was free to treat the entire FSA as "broken," and sue Wal-Mart immediately for breach of the entire FSA. *Id.* at 266. Because Fingerhut was free to treat the entire FSA as broken, Fingerhut was also relieved of any future performance under the FSA. *See id.* Fingerhut did in fact treat the entire FSA as broken prior to the end of its Term, by filing this lawsuit in November 2001, claiming damages from Wal-Mart in the amount of the entire Minimum Services Fee, or $3,196,813.

### B. The Terms of the FSA Require Wal-Mart to Pay a Minimum Services Fee in Each Month Where its Actual Package Volume Failed to Meet Forecasted Volumes, Including the Months of July 2001 Through January 2002.

Under New York law,[13] language employed in an agreement should be given a practical interpretation that reflects the parties' reasonable expectations at the time they entered into the contract. *See, e.g., John E. Andrus De Buono*, 688 N.Y.S.2d 687, 688 (N.Y. App. Div. 1999); *Gonzalez v. Norrito*, 682 N.Y.S.2d 100, 101 (N.Y. App. Div. 1998); *Partrick v. Guarniere*, 612 N.Y.S.2d 630, 632 (N.Y. App. Div. 1994); *Long Island Savings Bank F.S.B. v. Geloda/Briarwood Corp.*, 596 N.Y.S.2d 808, 810 (N.Y. App. Div. 1993). In addition, a contract must not be interpreted in a way that would leave any provision without force and effect. *Andrus*, 688 N.Y.S.2d at 688; *Gonzalez*, 682 N.Y.S.2d at 101; *Partrick*, 612 N.Y.S.2d at 632.

[13] It is undisputed that the Agreement provides in Section 21(g) that the law of the State of New York will govern.

The provisions of the Fulfillment Services Agreement, when taken as a whole, reflect the parties' intent that Wal-Mart agreed to pay a Minimum Services Fee in any month during the Initial Term where its actual package volumes failed to meet pre-forecasted levels, including months when its actual package volume was "0."

First, the Agreement clearly states at Section 5 that it is a contract of definite duration – the Initial Term lasted from June 1, 2000, through January 31, 2002. Section 5 of the Agreement also states that during the Initial Term, the contract may be terminated only for cause. Included in this provision is a clause which allows the parties to "meet and confer" to discuss and evaluate pricing, "depending on the parties' respective costs and circumstances at such time." These provisions clearly bind both parties to their agreement from June 1, 2000 through January 31, 2002.

Next, several provisions of the FSA require Wal-Mart to pay Fingerhut, (a) a Services Fee, and (b) a Minimum Services Fee, if applicable, for each month of the Agreement's Initial Term:

- Section 2(b): "Each month following the Effective Date, [Wal-Mart] shall pay to FBSI a fee (Services Fee) for all Fulfillment Services provided by FBSI (including a Minimum Services Fee) with respect to the preceding calendar month. The pricing of the Service Fee is set forth in Schedule A."
- Schedule A: "In accordance with the terms of the Agreement, [Wal-Mart] shall pay a Monthly Minimum Services Fee to FBSI during the term."
- Schedule A: "Each month during the Term [Wal-Mart] shall pay the greater of one of the following Minimum Services Fees."

Under New York Law, terms that are unambiguous must be construed according to their plain meaning. *Russack v. Weinstein*, 291 A.D.2d 439, 441 (N.Y. App. Div. 2002). The FSA unambiguously reflects the parties' intent to be bound by the terms of the FSA for the entire Initial Term – from June 1, 2000, through January 31, 2002. Section 2(b) of the FSA and

Schedule A also clearly state that Wal-Mart shall pay Fingerhut a Minimum Services Fee (when applicable) for "each month during the Term." Contrary to Wal-Mart's contentions, no term or provision in the contract allows for fees to be paid "only if" Wal-Mart uses Fingerhut's services, and no such term may be implied into the contract. *Petracca v. Petracca*, 302 A.D.2d 576 (N.Y. Sup. Ct. 2003) (court may not write into a contract conditions the parties did not include by adding or excising terms under the guise of construction, nor may court construe language of agreement in such a way that would distort the contract's apparent meaning).

### C. The Total Amount of the Minimum Services Fee for the Months of July 2001 Through January 2002 is $3.196 million, not $0.

Wal-Mart contends that even if it were required to pay a Minimum Services Fee, the Fee would amount to $0 for the months of August 2001 through January 2002, because Wal-Mart did not actually ship any packages through Fingerhut for those months.[14] Again, words of a contract are to be given their plain and ordinary meaning, *Russack*, 291 A.D.2d at 441, and all of the provisions of a contract are to be considered so that no provision is rendered meaningless or without force and effect. *See Andrus*, 688 N.Y.S.2d at 688; *Gonzalez*, 682 N.Y.S.2d at 101; *Partrick*, 612 N.Y.S.2d at 632; *Long Island Savings Bank F.S.B.*, 596 N.Y.S.2d at 810.

The pertinent calculation of the Minimum Services Fee is set forth in detail in Schedule A of the FSA, at pages 7-9.[15] Fingerhut will offer the testimony of several of Fingerhut's

---

[14] Fingerhut is not aware of any argument or defense advanced by Wal-Mart to justify its refusal to pay the Minimum Services Fee in July 2001, even under Wal-Mart's interpretation of the FSA, when it forecasted 5,000 shipments through Fingerhut, but only actually shipped 2,589 shipments.

[15] Again, although Schedule A delineates two circumstances when the Minimum Services Fee would apply, the parties do not dispute that only the second of the two formulas is at issue in this lawsuit.

witnesses, each of whom are capable of applying the contract language to explain calculation of the Minimum Services Fee.[16]

The relevant Minimum Services Fee is calculated by multiplying two defined terms: Minimum Packages x Package Fee.

1. **<u>The First Multiplier: Minimum Packages.</u>**

The term "Minimum Packages" is defined at page 8 of Schedule A as the "difference between 75% of the Forecast Package Volume . . . and the actual number of packages shipped during the month." In other words:

**(Forecast Package Volume x 75%) – Actual Number of Packages Shipped = Minimum Packages**

One of the parties' fundamental disagreements concerns the proper definition of "Forecast Package Volume," set forth in detail at Part II.E above. Wal-Mart contends, incorrectly, that subdivision (b) "drops out" after May 2001, and that the Minimum Services Fee "becomes" the greater of (a) or (c). Wal-Mart's interpretation of the Forecast Package Volume is not supported by the language of Schedule A. Notably, Wal-Mart's argument fails to address why the first annual forecast is appended to the contract at all, if the parties simply intended the first year's annual forecast were simply to drop out of the contract entirely, only to be replaced in whole by a subsequent year's annual forecast. In other words, if the 2000-2001 Annual Forecast were not to remain in the FSA as one of the three forecasts against which Wal-Mart's actual volumes were compared, then it would simply have been submitted to Wal-Mart in conjunction with executing the FSA, rather than appended to the Agreement itself.

---

[16] Those witnesses, all of whom have been deposed, include: Gary Bledsoe, William Bretherton and Michael Murray.

Rather, the actual language of the FSA clearly supports Fingerhut's understanding of the Forecast Package Volume. First, the Agreement specifically states that Forecast Package Volume is the greater of: (a) a rolling three-month forecast; or (b) the annual forecast for the first year appended to the Agreement; or (c) the annual forecast provided for any successive renewal year. Terms that are unambiguous must be given their plain and ordinary meaning. *Russack*, 291 A.D.2d at 441.

Second, nothing in the FSA indicates that after the first year, the annual forecast appended to the FSA is no longer considered in determining the Minimum Services Fee, and nothing in the FSA says that subdivision (c) supersedes and replaces subdivision (b) after May 2001. Clearly, had Wal-Mart contemplated that subdivision (b) would drop out entirely after May 2001, it could easily have drafted a provision to effectuate the same. Instead, Wal-Mart negotiated the contract language that provided for three alternative forecasts to be considered after May 2001, by approving of the express contract language that defines the Forecast Package Volume as the greater of (a) or (b) or (c).

In fact, with respect to subdivision (c), Wal-Mart and Fingerhut did negotiate a provision to take into account multiple annual forecasts after the first year. Subdivision (c) states that

> with respect to each year after the expiration of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company in the month of March prior to commencement of the following one-year period under the Agreement.

The FSA was negotiated for a 19-month term, with automatic annual renewals absent 90-days' written notice. Subsection (c) contemplates successive annual renewals pursuant to the Term provision of the FSA, and states that in the event of multiple annual renewals, the annual forecast for the most recent renewal year will be considered to determine the Forecast Package Volume. Had Wal-Mart intended that the first year's annual forecast drop out all together and not be

considered in determining the Forecast Package Volume, Wal-Mart could easily have drafted language to effectuate this goal. But the language of the FSA, as it was negotiated and drafted by the parties, does not provide for such an interpretation. It is clear that Wal-Mart adopted its current interpretation of the Forecast Package Volume as an after-the-fact liability defense that does not accord with the intentions of the parties when they entered into the FSA, or the plain language of the FSA itself.

Moreover, Wal-Mart's interpretation ignores well accepted rules of contractual interpretation. *See Andrus*, 688 N.Y.S.2d at 688 (language employed in an agreement should be given a practical interpretation that reflects the parties' reasonable expectations at the time they entered into the contract; contracts must not be interpreted in a way that would leave any provision without force and effect); *Gonzalez*, 682 N.Y.S.2d at 101 (same); *Partrick*, 612 N.Y.S.2d at 632 (same).

Wal-Mart's interpretation is, for example, contrary to the language and reasonable expectations: that Fingerhut shall be a services provider for the duration of the Term; that during the Term the FSA could only be terminated for cause; that during the Term Wal-Mart's business would be conducted pursuant to an agreed upon business plan; and that a Services Fee, including the Minimum Services Fee, would be paid every month. *See* FSA §§ 1(a); 5(a)-(b); 4(a); and 2(b).

Fingerhut's interpretation that the Forecast Package Volume is a comparison of <u>three</u> different forecasts also accords with the extrinsic evidence. First, it cannot be disputed that Fingerhut requested amending the Original Agreement to the FSA in order to provide itself with pricing security in light of a need to cover the costs of making capacity available. Second, Wal-Mart did not contemplate that its subsequent annual forecasts would be less than the annual

forecast attached to the FSA. Rather, Wal-Mart employees will testify that they believed the Internet retail market would trend sharply upwards and that Wal-Mart's own volume would be much higher after the first year. Further, there was an understanding that, during the Initial Term, the relationship and its obligations could only be ended for cause. Finally, internal Wal-Mart documents drafted at the time of negotiations show that the annual forecast appended to the FSA was much more conservative than Wal-Mart's internal forecasts. There was no intent or attempt to bargain for the first annual forecast dropping out altogether after May 2001.

In addition, under well-established law, if parties have attached different meanings to a term in the contract, "it is interpreted in accordance with the meaning attached to one of them if at the time the agreement was made...that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party." *See* RESTATEMENT (SECOND) CONTRACTS § 201(b). Here, Wal-Mart clearly knew that Fingerhut required pricing guarantees, and that Fingerhut demanded economic security to cover its significant capital outlay, regardless of Wal-Mart's actual volumes. Appending the annual forecast to Schedule A and basing the Minimum Services Fee, in part, on this forecast addressed Fingerhut's concerns, and was communicated prior to execution of the FSA.[17] Conversely, Wal-Mart never communicated any purported understanding that subsection (b) "dropped out," or that the annual forecast attached to the Agreement and made a part thereof simply ceased to have any

[17] The evidence will show that, during the parties' negotiations of the FSA, Fingerhut repeatedly asked for a provision in the contract that would provide for a minimum fee for each month of the contract, in order to provide Fingerhut with economic stability in light of Wal-Mart's fluctuating forecasts and uncertain needs. The evidence will also show that Fingerhut explained to Wal-Mart on more than one occasion that the Minimum Services Fee was required in each month of the Agreement in order to place Fingerhut in a position to perform the terms of the Agreement. Wal-Mart agreed to such a minimum fee, and the Minimum Services Fee was negotiated by the parties and placed into the FSA.

meaning at all prior to the end of the Agreement's Term. For this additional reason, Fingerhut's interpretation of the Forecast Package Volume must therefore control.

Based on the foregoing principles and evidence, Fingerhut will prove that the following chart represents the accurate amount of "Minimum Packages" for each month after Wal-Mart unilaterally terminated the FSA without cause:

| **Month** | **Forecast Package Volume**[18] | **x** | **75%** | **-** | **Actual Packages Shipped** | **=** | **Minimum Packages** |
|---|---|---|---|---|---|---|---|
| July | 11,000 | x | 75% | | 2589 | = | **(8,250-2,589[19]) = 5,661** |
| August | 11,000 | x | 75% | | 0 | = | **8,250** |
| September | 20,000 | x | 75% | | 0 | = | **15,000** |
| October | 100,000 | x | 75% | | 0 | = | **75,000** |
| November | 405,000 | x | 75% | | 0 | = | **303,750** |
| December | 490,000 | x | 75% | | 0 | = | **367,500** |
| January | 32,000 | x | 75% | | 0 | = | **24,000** |

---

18 The numbers provided in this column are taken from Schedule A of the FSA, Wal-Mart's Annual Forecast for June 2000 through May 2001, in accordance with section (b) of the Minimum Services Fee provision, defining "Forecast Package Volume."

19 Wal-Mart actually shipped 2,589 packages through Fingerhut in July 2001. However, because the actual number of packages shipped did not meet or exceed the Annual Forecast appended to the Agreement, the Minimum Services Fee was triggered. Note that by shipping even a minimal amount of packages, Wal-Mart saved significant expense in the Minimum Services Fee. This is because the Minimum Services Fee works on a sliding scale – the more packages shipped, the lower the Minimum Services Fee. And no Minimum Services Fee is charged in any month where the actual number of packages shipped meets or exceeds the Forecast Package Volume.

### 2. The Second Multiplier: Package Fee.

The other multiplier, a Package Fee, is defined in Schedule A at page 8, and equals the Package Fulfillment Fee "based on the actual average number of items per package shipped during the month." The agreed upon Package Fulfillment Fee is also defined in Schedule A, at page 3. It provides that conveyable units will be "billed at $3.32 per single unit package and $.88 for each additional unit in the package." If the unit is non-conveyable, the billing rate is higher. Thus, to determine the Package Fee, the Package Fulfillment Fee is multiplied by the actual average number of items per package for the month in question:

**Package Fulfillment Fee x Actual Average Number of Items Per Package = Package Fee**

In an attempt to side-step its promise to pay the monthly Minimum Services Fee, and in particular its promise to pay the Fee when the packages shipped are less than Forecast Package Volume, Wal-Mart contends there is no Package Fee whatsoever for the months of August through January because no packages were shipped. As such, exclusively by virtue of Wal-Mart's decision to unilaterally terminate the Agreement, the "actual" average number of items per package for those months is "zero." Further building on its own decision not to perform, Wal-Mart argues that no Minimum Services Fee is owing.

The evidence at trial will show that Wal-Mart's current interpretation of the FSA is not consistent with the reasonable expectations of the parties when they entered into the contract; that Wal-Mart's interpretation leaves several other provisions without force and effect; and that Wal-Mart simply intended to terminate the FSA without cause and attempted to find an after-the-fact interpretation that would relieve it of its financial obligations to Fingerhut. *Andrus*, 688 N.Y.S.2d at 688; *Gonzalez*, 682 N.Y.S.2d at 101; *Partrick*, 612 N.Y.S.2d at 632.

First, the language of the FSA, taken as a whole, supports the conclusion that the "actual average number of items per package" must be a number higher than "zero." The Package

Fulfillment Fee states that the Fee is based on "a package's ability to travel the conveyor system and Schedule B." Wal-Mart's Company Business Plan, appended at Schedule B, states that the "average number of units per parcel" is 1.77. Nothing in the FSA, Schedule A, or the Company Business Plan supports an interpretation of the Agreement that the average number of units may be "0." Finally as a matter of common sense, Wal-Mart agreed to use Fingerhut as its fulfillment service provider from June 2001 through January 2002. In doing so, Wal-Mart impliedly agreed to ship packages through Fingerhut each month. Shipping just one package with one item in it would bring the actual average number of items per package to "1," and is not inconsistent with the terms of the FSA.

New York law is clear, that where the circumstances at the time the contract was executed indicate that a contingency could have been foreseen, but was not addressed, the agreement will be enforced according to the stated terms. *See, e.g., Petracca*, 302 A.D.2d at 576 (court may not write into a contract conditions the parties did not include by adding or excising terms under the guise of construction, nor may court construe language of agreement in such a way that would distort the contract's apparent meaning). To adopt Wal-Mart's interpretation would allow Wal-Mart to effectively terminate the FSA without cause through nonperforming conduct and is contrary to contract terms. Indeed, under Wal-Mart's strained interpretation, a Minimum Services Fee would be owing if Wal-Mart performed the FSA and shipped only one package during a month, but no Fee is owed if Wal-Mart breached the FSA by not shipping a single package.

Although a practical interpretation of the terms of the FSA supports Fingerhut's interpretation, in addition, New York law also implies in every contract a covenant of good faith and fair dealing which

> . . . includes an implied undertaking on the part of each party to the contract that each will not intentionally or purposely do anything to prevent the other party from carrying out the Agreement on his part. . . Stated otherwise, the implied covenant of good faith means that neither party to the contract shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the benefit of the contract.

*Designers North Carpet, Inc. v. Mohawk Industries, Inc.*, 153 F. Supp. 2d 193, 196 (E.D. N.Y. 2001); *see also, Chemical Bank v. Stahl*, 712 N.Y.S.2d 452, 462 (N.Y. App. Div. 2000); *Gelder Medical Group v. Webber*, 394 N.Y.S.2d 867, 871 (N.Y. 1977). Here, unquestionably, Wal-Mart intentionally chose to destroy or injure the rights of Fingerhut to receive the benefit of the Agreement. *Id.* Specifically, without cause, Wal-Mart chose to direct its fulfillment business to another provider and to its own facility of recent construction. Wal-Mart unequivocally prevented Fingerhut from performing the FSA, by pulling all of its inventory from Fingerhut's facility, and by refusing to ship even a single package through Fingerhut from August 2001 through January 2002. Having chosen to have no actual packages shipped through Fingerhut, Wal-Mart cannot, consistent with a covenant of good faith and fair dealing, preclude a proper calculation of the Package Fee.

Although the FSA clearly requires that the actual average items per package is something more than "0," a more accurate calculation of the Package Fee relies upon Wal-Mart's business plan at Schedule B. As made clear by Section 4(a) of the Agreement, Schedule B is the cornerstone upon which pricing was based:

> As of the date hereof, Company represents that it desires to conduct its internet direct-to-consumer business in accordance with the specifications set forth in Schedule B attached hereto ("Company Business Plan"). Company acknowledges and understands that the terms contained within Schedule A are contingent upon the Company Business Plan.

Schedule B provides that the "Average Number of Units Per Parcel" is 1.77. Utilization of the 1.77 average results in a package fee of $4.00 for each of the months during which Wal-Mart

chose to have no packages available for shipment.[20] Notably, this Package Fee is lower than that which was calculated utilizing the actual numbers for several months where Wal-Mart performed, and Fingerhut will also show that it is lower than Wal-Mart's own internal risk analysis, which employed a $5.04 figure for the Package Fee.

### 3. Calculation of the First and Second Multiplier to Determine the Amount of Minimum Services Fees Owing.

Based on the foregoing legal principles and evidence, Fingerhut will prove that Wal-Mart is required to pay Fingerhut the Minimum Services Fees as set forth in the chart below:

| **Month** | **Minimum Packages** | **x** | **Package Fee** | **=** | **Minimum Services Fee** |
|---|---|---|---|---|---|
| July | 5,661 | | $4.03[21] | | $22,813.80 |
| August | 8,250 | | $4.00 | | $33,000.00 |
| September | 15,000 | | $4.00 | | $60,000.00 |
| October | 75,000 | | $4.00 | | $300,000.00 |
| November | 303,750 | | $4.00 | | $1,215,000.00 |
| December | 367,500 | | $4.00 | | $1,470,000.00 |
| January | 24,000 | | $4.00 | | $96,000.00 |
| **TOTAL:** | | | | | **$3,196,813.00** |

---

[20] The $4.00 is calculated by applying the Package Fulfillment Fee of $3.32 per single unit package and $.88 per each additional unit in the package (as provided in Schedule B) for an average of 1.77 units per package. The actual math is: $3.32 + $.68 ($.88 x 77%) = $4.00.

[21] Because Wal-Mart actually shipped 2,589 packages through Fingerhut in July 2001, the calculation of the Package Fee results in a Package Fee of $4.03. The actual math is = $3.32 +.71 (.81 x 88).

**D. Awarding Fingerhut the Parties' Previously Negotiated Minimum Services Fee of $3,196 Million Does Not Result in a Windfall to Fingerhut.**

Based on Wal-Mart's summary judgment opposition, it is expected that Wal-Mart will argue that awarding Fingerhut the Minimum Services Fee as required by the FSA will result in a windfall to Fingerhut. Specifically, Wal-Mart is expected to contend that Fingerhut should receive no more than the Minimum Service Fee minus variable costs. Wal-Mart's argument ignores the fact that reduced shipping volume, not to mention an abandonment of the Agreement in its entirety, results in less revenue for Fingerhut. Specifically, the elimination of volume also eliminated the other Service Fees Fingerhut would have received under Schedule A. Had Wal-Mart not abandoned its obligations, Fingerhut would have received far more revenue than the Minimum Services Fees. In fact, Fingerhut will introduce evidence that will show that in the months that Wal-Mart performed under the FSA, the Minimum Services Fee, if applied at all, was not a major component of the overall fees to Fingerhut in a given month.

As previously explained, the Minimum Services Fee increases when shipping orders go down. The rationale, of course, is to compensate Fingerhut adequately when order volume does not allow Fingerhut to earn sufficient compensation through Services Fees. Wal-Mart's suggestion that variable costs should be deducted is contrary to the bargain as written as well as its rationale.

Requiring a customer to pay a Minimum Services Fee or other fixed fee for the term of a contract is appropriate where the servicing party is required to outlay substantial resources in order to make its services available. *See, e.g., City of Memphis, Tennessee v. Ford Motor Co.*, 304 F.2d 845 (6th Cir. 1962) (customer required to pay utility company minimum services fee for remainder of contract term); *Oliver-Mercer Electric Cooperative, Inc. v. Fisher*, 146 N.W.2d 346 (N.D. 1966) (upholding minimum services fee for fixed term in connection with a supply of

electricity); *Olsen Media v. Energy Services, Inc.*, 648 P.2d 493 (Wash. App. 1982) (client required to pay advertising agency monthly retainer for remainder of contract term). Similarly, a New York court has held that a school is allowed to recover tuition for the entire year even after the student was expelled. *Van Brink v. Eugene H. Lehman*, 192 N.Y.S. 342 (N.Y. App. Div. 1922).

*City of Memphis, Tennessee v. Ford Motor Co.*, 304 F.2d 845 (6th Cir. 1962) is instructive. In *City of Memphis*, Ford Motor Company ("Ford") entered into a 5-year utility services contract with the City of Memphis, for the provision of electricity. *City of Memphis*, 304 F.2d at 847. The contract contained a minimum monthly payment provision, stating that during each month of the contract Ford was required to pay the greater of either $1.20 per kilowatt times the highest demand established during the preceding 12 month period, or contract demand. *Id.* A little more than two years into performance of the contract, Ford sold its plant and moved from Memphis, discontinuing all use for electricity. *Id.* The City of Memphis sued Ford for anticipatory breach of contract seeking the minimum monthly fee for each month of the contract Ford did not pay, until contract termination. *Id.*

Ford denied liability, arguing that the contract provided, and the City agreed, to supply Ford only with the amount of energy Ford actually required. *Id.* at 847. When Ford ceased to actually use any electricity supplied by the City of Memphis, its monetary obligation to the City of Memphis also ended. *Id.* Ford argued in the alternative that the language contained in the schedule attached to the contract was ambiguous, and could be construed to require Ford only to pay for actual use of the City of Memphis' services. *Id.* at 848. Because Ford's actual use was zero, its payments to the City of Memphis were also zero. *Id.* The court rejected Ford's arguments, stating that

> The parties are in direct conflict as to the interpretation of the contract and the schedule which is included therein. The five-year term of the contract is plain; and the provision for payment of minimum monthly bills is plain....The obligation to pay such minimum monthly bills during the five-year period, expressed with such definiteness and certainty in the contract, is incongruous with a provision that is sought to be interpreted as giving Ford a complete release from such contractual liability whenever it desired. While a construction, such as contended for by Ford, can be deduced from the schedule, it seems a rather surprising interpretation from phraseology not clearly expressed, and would result in a contract that is contrary to, and destructive of the other provisions which are clearly expressed.

*Id.* at 849. The court embraced the standard rules of contract construction,[22] to conclude that Ford was required to pay the City of Memphis the minimum monthly fee for each month remaining in the contract's term after Ford closed its plant and moved from Memphis. *Id.* at 852.

Like the utility services contract in *City of Memphis*, the FSA plainly states that its term is from June 1, 2000, through January 31, 2002. The FSA also clearly provides that Wal-Mart shall pay to Fingerhut a Services Fee and a Minimum Services Fee, if applicable, during each month following the Effective Date. Also like the minimum monthly bill in *City of Memphis*, the provision of a Minimum Services Fee in the FSA was specifically bargained for by the parties at the time they entered into the FSA. Fingerhut demanded a Minimum Services Fee in order to provide Fingerhut with a steady source of revenue to pay for the large expenditures incurred to make its fulfillment services available to Wal-Mart. This security was required by Fingerhut, given its dedication of space capabilities and services to Wal-Mart, and the high improbability that Fingerhut would be able to adequately recoup its costs or replace the Wal-Mart business on

22 "On the whole, the meaning of the contract is not so clear as to make it improper to admit evidence as to the circumstances surrounding its execution. In such circumstances, the court is called upon, in construing the agreement to ascertain the intention of the parties from the circumstances surrounding the execution of the contract. A contract must be construed as a whole and effect given to its every part. The cardinal rule with respect to construction of contracts is to give effect to the intention of the parties in the light of the surrounding circumstances." *City of Memphis*, 304 F.2d at 849.

short notice. In addition, such economic security was reasonable, in light of Wal-Mart's lack of historical basis upon which to gauge future shipping levels, the newness of the Internet retail business, and in response to the substantial losses Fingerhut incurred partially as a result of the pricing contained in the parties' Original Agreement, which contained no guarantee or minimum fee.

When the parties renegotiated the Original Agreement, Fingerhut specifically proposed to Wal-Mart various ways to integrate a minimum fee structure, and the parties finally agreed upon the Minimum Services Fee set forth in Schedule A. The FSA, including Schedule A and the Minimum Services Fee, is the complete agreement negotiated by both of the parties. Wal-Mart expressly acknowledged at Section 21(i) of the FSA that it fully participated in negotiating the Minimum Services Fee, and that it had the opportunity to consult with its attorneys and accountants regarding the terms of the Agreement. In sum, Wal-Mart knowingly agreed to pay Fingerhut a Minimum Services Fee for <u>any</u> month during the entire term of the FSA when actual shipping volumes failed to meet forecasted volumes, including the forecasted volumes appended to the FSA at Schedule A.

Having agreed to so perform, Wal-Mart may not now ask the Court to change the parties' contract, even if Wal-Mart later determined the terms it negotiated were disadvantageous. "A court of law possesses no dispensing powers; it cannot inquire whether the parties have acted wisely or rashly, in respect to any stipulation they may have thought proper to introduce into their agreements….[T]he court is bound to enforce the agreement," absent fraud, circumvision, or illegality. *Sun Printing and Publishing Assn. v. William L. Moore*, 183 U.S. 642, 22 S. Ct. 240 (1902); *see also Maple Farms, Inc. v. City School District of the City of Elmira*, 76 Misc.2d 1080, 352 N.Y.S.2d 784 (N.Y. Supp. Ct. 1974) (economic hardship alone does not excuse

performance from a contract); *Gottesman & Co., Inc. v. International Telephone and Telegraph Corp.*, 102 A.D.2d 407 (N.Y. App. Div. 1984) (the law does not allow a party to unilaterally abrogate its agreement simply by showing that its performance had become economically burdensome).

Fingerhut's action for the Minimum Services Fee is likewise analogous to an action for the price under the Uniform Commercial Code. *See* McKinney's U.C.C. § 2-709. Under UCC § 2-709 (b), a seller may recover the price "of goods identified to the contract, if the seller is unable after a reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing." *See also Hyosung America, Inc. v. Sumagh Textile, Ltd.*, 137 F.3d 75, 79-80 (2nd Cir. 1998). Here, the dot-com bubble burst, there were no customers to replace Wal-Mart, and Fingerhut chose to minimize its losses by shutting down its fulfillment services business.

In sum, Wal-Mart negotiated the terms of the FSA, including the Minimum Services Fee provision, and may not now be heard to claim that the terms it negotiated are "unfair." Wal-Mart could easily have avoided the present situation, simply by adhering to the promises it made and by not walking away from the FSA prior to its termination.

**E. If the Jury Determines that Wal-Mart is Required to Pay Fingerhut the Minimum Services Fee of $3.196 Million, the Court Should Rule that, as a Matter of Law, the Minimum Services Fee is not Void as a Penalty.**

Wal-Mart mistakenly argues that the Minimum Services Fee is void as a penalty. As to this issue, Wal-Mart bears the burden of proof. *See Perma-Stone Bi County Corp. v. Ackerman*, 15 Misc.2d 640, 182 N.Y.S.2d 655, 657 (N.Y. Sup. Ct. 1959). Whether a contract provision is a valid liquidated damages clause or invalid penalty is a question of law for the court. *See* 36 N.Y. Jur.2d *Damages*, § 156. *See also LeRoy v. Sayers*, 635 N.Y.S.2d 217, 222 (N.Y. App. Div. 1995). In other words, this Court reaches Wal-Mart's defense only if the jury awards Fingerhut

$3.196 million in damages, and states that the damages are equal to the amount owed to Fingerhut under the Minimum Services Fee provision of the FSA.

Regardless, Wal-Mart's defense must fail. First, the Minimum Services Fee is not a liquidated damages clause, but instead it is a provision designed to compensate Fingerhut for the capacity and opportunity made available to Wal-Mart when shipping volumes fail to reach a level that would otherwise adequately compensate Fingerhut. Second, even assuming that the provision constitutes a liquidated damages clause, the sliding scale Minimum Services Fee is not a penalty when measured by applicable legal standards.

A liquidated damages clause is a provision in a contract that fixes in advance the amount of compensation a party is to receive in the event of a breach. *Truck Rent-A Center, Inc. v. Puritan Farms No. 2nd Inc.*, 361 N.E.2d 1015, 1017-1018 (N.Y. 1977); 36 N.Y. Jur.2d *Damages* § 154. Further, a liquidated damages clause exists only by virtue of express agreement of the parties, and a court will not read such a provision into a contract by implication. *Barry, Bette & Led Duke, Inc. v. State of New York*, 240 A.D.2d 54, 57 (N.Y. App. Div. 1998); 36 N.Y. Jur.2d *Damages* § 154. Here, on its face, the Minimum Services Fee is not a liquidated damages clause. It is not written as a provision to compensate Fingerhut in the event of a breach, nor is it anticipated that anyone will so testify. Rather, the plain purpose of the provision is to compensate Fingerhut for providing capacity to Wal-Mart when the shipping volume falls below defined levels necessary to provide for adequate compensation.

Assuming for the sake of argument that the Minimum Services Fee provision is a liquidated damage clause, it is not void as a penalty. Liquidated damages clauses are valid under New York law if (a) at the time the parties entered into the contract, damages flowing from a potential breach would be difficult to ascertain; and (b) the amount of damages fixed in advance

was a reasonable measure of the anticipated probable harm. *BDO Seiman v. Hirshberg*, 712 N.E.2d 1220, 1227 (N.Y. 1999). Wal-Mart's penalty argument fails under both prongs.

This is a classic case where damages would be difficult to estimate at the time of contracting. In the year 2000, there were tremendous hopes for e-commerce, but little track record. Indeed Wal-Mart itself was a newcomer to e-commerce, and its own witnesses will concede that while expectations were high, the future was not clearly foreseeable. The evidence will show that even after performing under the Original Agreement for several months, at the time the parties negotiated the FSA, neither Wal-Mart nor Fingerhut could anticipate in Spring 2000 just how many packages Wal-Mart would actually ship through Fingerhut over the course of the next 19 months. And because the payment structure without the Minimum Services Fee hinged almost entirely on the number of packages Wal-Mart actually shipped, it would have been nearly impossible at that time to know what Fingerhut's damages would be if Wal-Mart breached the FSA.

Further, the Minimum Services Fee is a reasonable measure of damages at the time of contracting. First, the losses expected to be sustained if Wal-Mart (Fingerhut's marquee customer and arguably the largest retailer in America) breached would have been expected to be substantial. Second, because the Minimum Services Fee is predicated upon Wal-Mart's own forecasts, Wal-Mart will have difficulty arguing that the predicate was unreasonable. Moreover, Wal-Mart witnesses will likely concede that, although forecasting was difficult, they expected the business to grow. Indeed, the chief Wal-Mart negotiator has admitted that he felt that the business was going to be a "multibillion dollar business" and that the internet business would "really take off." Finally, the Minimum Services Fee employs a sliding scale formula. Specifically, one of the multipliers, "Minimum Packages" becomes larger in proportion to the

amount that the actual number of packages shipped is less than the forecast provided. Of course, this augments the reasonability of the Fee because, the more that actual packages falls below forecast, the less opportunity Fingerhut has to earn other Service Fees under Schedule A. As such, should the Court address Wal-Mart's defense, the Court must find that the Minimum Services Fee is neither a liquidated damages clause nor a penalty. In the alternative, if the Minimum Services Fee does constitute a liquidated damages clause, it is not void as a penalty.

## IV. CONCLUSION.

This is a case of contract interpretation. Wal-Mart and Fingerhut entered into a contractual obligation whereby Wal-Mart agreed to pay for, and Fingerhut agreed to provide, fulfillment services from June 1, 2001, through January 31, 2002. Without justification or excuse, Wal-Mart walked away from the Agreement in August 2001, prior to the end of the Term. Wal-Mart now refuses to pay Fingerhut the negotiated and agreed upon Minimum Services Fee of $3,196,813 for those months. Wal-Mart's refusal to abide by its legal and contractual obligations mandates judgment in favor of the Plaintiff. In addition, relevant statutory and case law, and the Federal Rules of Civil Procedure, requires Wal-Mart to pay Fingerhut its prejudgment interest, in an amount to be determined at the close of trial.[23]

---

[23] In the event the jury returns a verdict in favor of Fingerhut, Fingerhut expressly reserves its right to seek an Order from the Court granting prejudgment interest on the amount of the verdict.

Respectfully submitted,

**OPPENHEIMER WOLFF & DONNELLY LLP**

Dated: October 22, 2004

By s/ Edward M. Laine
Edward M. Laine, #59535
Katherine M. Wilhoit, #313853
3400 Plaza VII Building
45 South Seventh Street
Minneapolis, Minnesota 55402
Telephone: (612) 607-7000
Facsimile: (612) 607-7100

Lori V. Douglas
Assistant Counsel
Federated Department Stores
Regional Law Department
219 Perimeter Center Parkway, Suite 511
Atlanta, Georgia 30346
Telephone: (770) 913-5512

**ATTORNEYS FOR FINGERHUT BUSINESS SERVICES, INC.**