UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Fingerhut Business Services, Inc.,

Plaintiff,

v.

Wal-Mart.com, Inc.,

Defendant.

Civil File No. 01-CV-1261 DSD/SRN

# DEFENDANT WAL-MART.COM, INC.'S MEMORANDUM IN OPPOSITION TO FBSI'S MOTION FOR SUMMARY JUDGMENT

## FILED UNDER SEAL

**EXHIBIT A**

## INTRODUCTION

This dispute is one over interpretation of contract language. The starting point is the contract itself. For the reasons explained below, WalMart.com believes that the clear language of the contract supports its position that it did not breach the contract and does not owe Fingerhut Business Services, Inc. any damages. The contract language does not support Fingerhut's position that it is entitled to summary judgment. Moreover, if the Court concludes that the contract language is ambiguous, the extrinsic evidence of the parties' understanding and intent overwhelmingly supports Wal-Mart.com's position as to the contract's meaning. For these reasons, Fingerhut's motion for summary judgment should be denied.

## FACTS

This dispute is over whether the terms of the Fulfillment Services Agreement, effective June 1, 2000 ("Agreement"), permit Wal-Mart.com to submit a forecast of zero (0) packages for the period August 1, 2001 through January 31, 2002, the end of the contract term. While the plain language permits this, Wal-Mart.com believes that the summary factual information below will aid the Court in understanding the issue at hand.

### A. The 1999 Fulfillment Services Agreement

To enter the world of e-commerce, Wal-Mart Stores, Inc. ("Wal-Mart") established a website. In 1999, Wal-Mart executed a Fulfillment Services Agreement ("1999 Agreement") to fill its internet orders with Fingerhut, a subsidiary of Federated Department Stores. See Deposition of Lee Wilwerding ("Wilwerding Dep.") at p. 23-24,

excerpts of which are attached to the Affidavit of Jonathan A. Strauss ("Strauss Aff.") as Exhibit 1. Under the 1999 Agreement, after the website received internet orders, the orders were picked, packaged and shipped from Fingerhut's Western Distribution Center in Utah. Id. at p. 23-27. Although expectations were high for both parties at the time, on-line internet shopping was a recent innovation, creating much uncertainty regarding the relationship's overall success. See Wilwerding Dep. at p. 25-26, 43-44, 57-59, 106; Deposition of Gary L. Bledsoe ("Bledsoe Dep.") at p. 21, excerpts of which are attached to the Strauss Aff. as Exhibit 2.

**B. Third-Party Fulfillment of E-Commerce Orders Was a New Business for All Concerned**

For both Fingerhut and Wal-Mart Stores, internet third-party fulfillment was a new business. See Wilwerding Dep. at p. 12-13, 25-26, 43-44, 57-59, 106; Bledsoe Dep. at p. 21. Fingerhut's Western Distribution Center had been built from 1994-1996, measuring over one million square feet. See Wilwerding Dep. at p. 107. Fingerhut only became involved in third-party fulfillment in 1997, when it created the entity, Fingerhut Business Services. See Wilwerding Dep. at p. 13; Deposition of William Bretherton ("Bretherton Dep.") at p. 21-22, excerpts of which are attached to the Strauss Aff. as Exhibit 3. The Western Distribution Center was vacant until 1999, at which time its first substantial customer, Etoys, Inc. ("Etoys") moved in. See Bretherton Dep. at 21-22; Wilwerding Dep. at p. 19. In preparation for what was expected to be tremendous growth, Wal-Mart created Wal-Mart.com, the defendant in this action. See Wilwerding Dep. at p. 34.

Forecasting volumes for a newly launched e-commerce business, like Wal-Mart.com, proved to be very challenging. As Lee Wilwerding, Wal-Mart's executive in charge of forecasting testified:

> Q. Was there also a risk associated with the fact that you did not have a good profile yet of what Wal-Mart's business would be like?
>
> A. Well, that would be a risk, and there were other businesses in that building as well and didn't -- and the same lack of profile was there for them.
>
> Q. Okay.
>
> A. Now, the dot com business, as evidenced by its crashing and burning, was a very high risk business, period --
>
> Q. Yeah.
>
> A. -- because it was an unknown.

See Wilwerding Dep. at p. 43-44. Wilwerding further testified:

> Q. Now, I take it from your testimony before, both in response to Mr. Laine's question and mine, that it's a fair statement that forecasting of this business, whether you're on the Fingerhut side or the Wal-Mart side, was something that was exceptionally difficult? Would you agree with that?
>
> A. Yes.
>
> . . .
>
> A. . . . not only is it a non -- inexact science -- that's a compliment -- it's -- it's just I had no basis for it. It would have been conjecture. Forecast is -- would -- gives it an aura of more than it would have deserved. I wasn't very comfortable with this one that ended up in the contract for the one-year period because I didn't have a clue what advertising or promotion or anything would go in there.

> And a Web site by and of itself doesn't draw any business, I mean, just like a store. If the stores don't advertise or establish a reputation, nobody goes in them. There has to be a reason to go there. And it's -- there was little history. The new site, which was to launch in fall, was still an unknown and just no comfort level at all that forecasting beyond 90 days in all honesty -- but I understood the need that Fingerhut had to at least get a one-year snapshot of what might happen.

Id. at p. 114-15, 117-18.

Gary Bledsoe, Senior Vice President in charge of client services for Fingerhut noted the difficulty Wal-Mart Stores faced forecasting volumes:

> A. It's a new business, absolutely.
>
> Q. So this was a new business not only for Wal-Mart but for lots of people.
>
> A. Yes.
>
> Q. And in than sense, then, the forecasting of this type of business is just inherently difficult, isn't it?
>
> A. It is.

See Bledsoe Dep. at p. 21.

**C. The 2000 Fulfillment Services Agreement**

In early 2000, the parties commenced negotiations for a new Fulfillment Services Agreement. With Wal-Mart.com coming into existence in late 1999, it became the party to any new contract with Fingerhut. The Agreement was executed in August 2000, and considered effective on June 1, 2000. Initially, the parties had been negotiating over a one year agreement but eventually agreed on a 20 month term to end on January 31, 2002. See Exhibit E attached to the Affidavit of Gary Bledsoe ("Bledsoe

Aff.") at p. 5.[1] The Agreement would be renewed annually, unless it were terminated in accordance with its terms. Id.

Wal-Mart.com agreed to cover ramp-up costs for Fingerhut, paying for training, labor and retention expenses separately as these expenses were incurred. Id. at p. 21-22. These ramp up costs would increase for larger forecasts. See Bledsoe Dep. at p. 39-40; Wilwerding Dep. at p. 113-14. The Agreement also required Wal-Mart.com to pay a monthly $7500.00 "Account Management Fee" each month. See Exhibit E attached to the Bledsoe Aff. at p. 25.

Fingerhut originally sought guaranteed minimum payments. See Wilwerding Dep. at p. 39-40. As part of the negotiations, Wal-Mart.com eventually agreed to a "Minimum Services Fee" that was included in the Agreement. See Exhibit E attached to the Bledsoe Aff. at p. 25-27. The "Minimum Services Fee" was determined by either comparing the number of packages shipped to the number of store keeping units ("SKUs") or by comparing the number of packages shipped to the forecasted volume. As Fingerhut has noted, only the second option is relevant in this dispute.

Under this second option, the "Minimum Services Fee" was determined by multiplying the "Package Fee" and the "Minimum Packages:"

---

[1] The body of the Agreement is numbered p. 1-15 on the bottom center of each page, and is followed by Schedules A & B where the page numbering commences again with page 1. To avoid confusion, Wal-Mart.com will instead cite to the number in the top right corner of each page (the facsimile line) of the Agreement and Schedule A as it is found in Exhibit E to the Bledsoe Aff. Please note that although the three pages of Schedule B are found at the end of the Exhibit E, the facsimile numbers of those pages precede those of Schedule A.

| | | | | |
|---|---|---|---|---|
| **"Package Fee"** | x | **"Minimum Packages"** | = | **"Minimum Services Fee"** |

"Minimum Packages" was determined by subtracting the "actual number of packages shipped during the month" from 75% of the "Forecast Package Volume:"

| | | | | |
|---|---|---|---|---|
| **75% of "Forecast Package Volume"** | - | **"actual number of packages shipped during the month"** | = | **"Minimum Packages"** |

The Agreement continued:

> The term "Forecast Package Volume" shall mean the greater of the (a) number of packages estimated to be shipped as set forth in the monthly forecast submitted by Company [Wal-Mart.com] to FBSI [Fingerhut] three (3) months immediately prior to the commencement of the subject month or (b) the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company upon execution of this Agreement and attached hereto or (c) with respect to each year after the expiration of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company in the month of March prior to commencement of the following one-year period under the Agreement.

See Exhibit E attached to the Bledsoe Aff. at p. 26-27.

**D. Fingerhut's Problems at the Western Distribution Center Did Not Stem From Wal-Mart.com**

Fingerhut alleges that the Western Distribution Center was "largely dedicated to Wal-Mart's business" and that Wal-Mart.com was using "valuable warehouse space." See Fingerhut Memorandum at p. 3. This simply was not true:

> A. It was never dedicated strictly to Wal-Mart. Wal-Mart was the smaller player in 1999. Wal-Mart was the largest player in 2000 because it was virtually the only player in 2000.
>
> Q. Well, in 2000 was it your understanding in negotiating the agreement that the facility was going to be largely dedicated to Wal-Mart?
>
> A. No, because there was plenty of both storage and shipping capacity in that facility that could accommodate other customers. And quite frankly, we hoped they would get other customers in there because it makes them more -- would have made them more of a viable business.

See Wilwerding Dep. at p. 108-09. During the 1999 Christmas season, Fingerhut's primary customer at the Western Distribution Center was Etoys. In fact, approximately 80% of the building's fulfillment that season was dedicated to Etoys, with the remaining 20% split among Wal-Mart.com and a few other customers. See Affidavit of Michael Kraemer ("Kraemer Aff.") at 2. Put another way, that season, Fingerhut was filling thousands of Etoys orders per day at the same time it was filling just hundreds of Wal-Mart.com orders. Id. Nonetheless, Wal-Mart Stores', and later Wal-Mart.com's contracts with Fingerhut included payments for the use of space. See Wilwerding Dep. at p. 48.

Fingerhut's real problems in 1999 and early 2000 actually derived from other sources. Fingerhut had many operational and management problems at the Western Distribution Center. Fingerhut fell behind in filling a large number of its orders. See Wilwerding Dep. at p. 54. Orders shipped by Fingerhut often contained the wrong items, and, Wal-Mart.com's customers sometimes found E-toys literature in their packages.

Id. at p. 54-55. Fingerhut also overstaffed the Western Distribution Center, making it inefficient and difficult to run. Id. at p. 49-50.

Etoys exited the Western Distribution Center in early 2000, and the parties went to arbitration because Fingerhut had failed to meet a number of contractual performance standards with respect to the speed and accuracy of the fulfillment. The arbitration panel held in favor of Etoys, and United States District Court for the District of Minnesota upheld the award of $2,512,202. See Fingerhut Business Services, Inc. v. Etoys, Inc., 2001 WL 1640075, at *7 (D. Minn. Sept. 6, 2001) (unpublished), attached to the Strauss Aff as Exhibit 4.

Although Wal-Mart Stores on-line orders During the 1999 Christmas season missed expectations, Gary Bledsoe, of Fingerhut, acknowledged:

> A: And I don't think there was any malice intent on anybody's part.
>
> Q. It was just the fact that it's a new business and you're trying to work things out.
>
> A. Absolutely.

See Bledsoe Dep. at p. 22. Fingerhut now claims to have lost at least $2,000,000 under the 1999 Agreement, with the great majority of these losses apparently stemming from labor expenses. See Bledsoe Aff. at 7; Bledsoe Dep. at p. 9; Wilwerding Dep. at p. 95-99. Fingerhut implies that the 2000 Agreement was negotiated with the idea that this loss would be recouped. See Fingerhut Memorandum at p. 3-5. Although Wal-Mart Stores had been informed that the 1999 Agreement was not profitable for Fingerhut, it first

learned of the alleged extent of Fingerhut's losses when it received Fingerhut's Memorandum. See Bledsoe Dep. at 23, 26-27; Wilwerding Dep. at 107-08; Kraemer Aff. at 4.

**E. Wal-Mart.com's Forecasts for June 2001 – January 2002**

In October 2000, Tom Cole, a senior official of Federated, Fingerhut's parent corporation, informed John Rittenhouse, the Chief Logistics Officer of Wal-Mart.com, that Fingerhut would be exiting the third-party fulfillment business and closing its Western Distribution Center in 2002. See Deposition of John Rittenhouse ("Rittenhouse Dep.") at p. 51-53, 88-90, excerpts of which are attached to the Strauss Aff. as Exhibit 5; see also Exhibit 6 attached to the Strauss Aff. For some time, Wal-Mart.com had been reviewing its fulfillment strategy. It decided that it needed fulfillment facilities located East of Utah. See Wilwerding Dep. at p. 52-53; Bretherton Dep. at 33-36. When Wal-Mart began negotiating the 1999 Agreement, it also informed Fingerhut that it planned to open its own fulfillment facilities by 2002. See Wilwerding Dep. at p. 23, Rittenhouse Dep. at p. 19-20. Thus, before the Agreement was signed in August 2000, Fingerhut knew that "ultimately, they [Wal-Mart.com] would take over complete control of their own operation." See Bledsoe Dep. at p. 51-52; see also Wilwerding Dep. at p. 79-80; 119-22. Fingerhut was also aware that it was not the exclusive fulfiller for Wal-Mart.com under the 2000 Agreement. See Exhibit E to the Bledsoe Aff. at p. 2 ("FBSI[Fingerhut] shall be *a* provider of Fulfillment Services for Company [Wal-Mart.com]"); Bretherton Dep. at p. 35; Wilwerding Dep. at p. 33; Kraemer Aff. at 6.

When Cole informed Rittenhouse that Fingerhut was ceasing third-party fulfillment, Wal-Mart.com decided to vacate the Western Distribution Center before January 31, 2002:

> Q. Do you remember at Wal-Mart you started evaluating the possibility of the cessation of use of the Utah facility prior to January 2001?
>
> A. When Tom Cole told me that Fingerhut was going to exit the business, it posed some strategic challenges for us because we no longer had the option to use Fingerhut to fulfill orders for our customers. From that point forward, we started to consider both tactical and strategic options, along with our forecast, along with the customer demand at the time, and so on.
>
> I'm trying to get to your question. I would say it was probably earlier in the year, January, February, would have been after the December holiday because Tom notified us pre the fourth quarter just going into the peak season. That's the best of my recollection.

See Rittenhouse Dep. at p. 51-52. Wal-Mart.com needed a stable, predictable fulfillment strategy which was not available from Fingerhut in the long-term. See Rittenhouse Dep. at p. 88-91. In accordance with the Agreement, Wal-Mart.com submitted a forecast phasing out its use of the facility. For the months of August 2001 through January 2002, the new forecast projected zero (0) parcels shipped. Id.; see also Exhibit 7 attached to the Strauss Aff.

## F. Procedural History

The procedural history of this matter, as described in Fingerhut's Memorandum, is accurate.

## ARGUMENT

### A. Summary Judgment Standard

In order to prevail on a motion for summary judgment under the Federal Rules of Civil Procedure, the moving party bears the initial burden of demonstrating that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989). Only if the moving party satisfies this initial burden does the responsibility shift to the non-moving party to adduce evidence or point to instances in the record that demonstrate a question of material fact to be resolved by a fact-finder. In arriving at a resolution, the court considering a motion for summary judgment must construe the evidence - and grant all reasonable inferences - in favor of the non-moving party, recognizing the evidentiary standards and ultimate burdens of proof that will apply at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In this case, therefore, Fingerhut must demonstrate that it will be able to prove each of its claims, rendering a trial superfluous. If, however, Wal-Mart.com can demonstrate the existence of at least a genuine factual issue as to Fingerhut's claims, summary judgment should not be granted.

### B. New York Contract Interpretation Standards

Under New York law, the Court should give effect to the mutual intention of the parties at the time of contracting. See Reiss v. Financial Performance Corp., 715 N.Y.S.2d 29, 34 (N.Y. App. Div. 2000) ("the essence of proper interpretation . . . is to

enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract"); Long Island Savings Bank v. Geloda/Briarwood Corp., 596 N.Y.S.2d 808,810 (N.Y. App. Div. 1993); (when interpreting contracts, courts must search for the probable intent of the parties).

The parties' intention should be derived from the language employed in the four corners of the agreement. See Transmedia Restaurant Co., Inc. v. 33 E. 61st Street Restaurant Corp., 710 N.Y.S.2d 756, 761 (N.Y. App. Div. 2000); W.W.W. Associates, Inc. v. Giancontieri et al., 565 N.Y.S.2d 440, 443 (N.Y. App. Div. 1990). When the language of the agreement is clear and unequivocal, the parties' intent is a question of law for the court to decide, and the Court will not look beyond the contract itself. See Continental Ins. Co. v. 115-123 W. 29th Street Owners Corp., 713 N.Y.S.2d 38, 39 (N.Y. App. Div. 2000); Hartford Acc. & Indem. Co. v. Wesolowski, 350 N.Y.S.2d 895, 898 (N.Y. App. Div. 1973).

However, if there is an ambiguity in the terminology used, or where there are internal inconsistencies pointing to an ambiguity, extrinsic evidence is admissible to determine the parties' intent. See Ruttenberg v. Davidge Data Systems Corp., et al., 626 N.Y.S.2d 174, 178 (N.Y. App. Div. 1995) (admitting parol evidence and denying summary judgment where the parties' intent was not clear from the four corners of the agreement); Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (N.Y. App. Div. 1999) (finding internal inconsistencies within a contract made the agreement ambiguous and allowing the examination of extrinsic evidence). "Summary judgment is

only appropriate where the intent of the parties can be determined form the four corners of their agreement, and where determination of that intent requires resort to extrinsic evidence, summary judgment must be denied." Ruttenberg, 626 N.Y.S.2d at 178 (internal citations omitted); see also Alexander & Alexander v. Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2nd Cir. 1998) (interpreting New York law and stating that if a court must resort to extrinsic evidence a material issue of fact necessarily exists and summary judgment is improper); Transmedia, 710 N.Y.S.2d at 761 (citing Hartford Acc. & Indem. Co., 350 N.Y.S.2d at 898, for the proposition that the determination of an ambiguity based on the credibility of extrinsic evidence should not be resolved by summary judgment).

**C. The Agreement Clearly Allows Wal-Mart.com to Submit a New Forecast**

The "Minimum Services Fee" indicates, in clause (c), that Wal-Mart.com will replace the forecast attached to the Agreement with another "annual" forecast. Thus, under the Agreement, there are two methods for determining the "Forecast Package Volume." For each month in the first year, it is the greater of either the monthly forecasts submitted three months out or the forecast attached to the Agreement. After the expiration of the Agreement's first year, it is the greater of the three month projection or the new forecast submitted by Wal-Mart.com replacing the one attached to the Agreement. Fingerhut's argument ignores clause (c), which states that it replaces (b):

> with respect to *each year after the expiration of the first (1st) year*, *the number* of packages estimated to be shipped in the subject month as set forth in the annual forecast *submitted* by Company [Wal-mart.com] in the month of March prior to

> commencement of the following one-year period. (emphasis added).

Included in the Agreement was a page entitled, "Annual Forecast of Estimated Number of Parcels to be Shipped." See Exhibit E attached to the Bledsoe Aff. at p. 29. This was the forecast described in clause (b) of the calculation of "Forecast Package Volume." One column listed twelve months from June to May and the other, the number of parcels for each respective month. Because Fingerhut and Wal-Mart.com agreed it would take Fingerhut about three months notice to plan for labor to meet Wal-Mart.com's projections, Wal-Mart.com was to also provide 90-day rolling forecasts. See Wilwerding Dep. at p. 76-77. The Agreement requires the new forecast to be submitted in March, three months before the last month of the first annual forecast. See Exhibit E attached to the Bledsoe Aff. at p. 27.

The forecast attached to the Agreement listed twelve months, ending in May, but the Agreement's term continued until January 31, 2002, eight more months. The Agreement also states that the annual forecast attached to it "cover[s] the period of June 2000 – May 2001." See Exhibit E attached to the Bledsoe Aff. at p.17. Gary Bledsoe, of Fingerhut, admitted that this clause referred to the forecast attached to the Agreement. See Bledsoe Dep. at p. 49.

Therefore, the clear language of the Agreement permits Wal-Mart.com to submit a new forecast for the period June 2001 through January 2002. There are no restrictions that prohibit a forecast of zero (0) for any or all of these months.

**D. Under the Agreement, When Wal-Mart.com Submitted a Forecast of Zero (0), the "Minimum Services Fee" Equaled Zero (0)**

The "Minimum Services Fee" was determined by multiplying "Minimum Packages" by the "Package Fee:"

| | | | | |
|---|---|---|---|---|
| **"Minimum Packages"** | **x** | **"Package Fee"** | **=** | **"Minimum Services Fee"** |

Since both variables, the "Minimum Packages" and the "Package Fee," were multipliers, if either one equaled zero (0), the "Minimum Services Fee" equaled zero (0). See Exhibit E attached to the Bledsoe Aff. at p. 26; see also Bledsoe Dep. at p. 47. As will be shown, when Wal-Mart submitted forecasts of zero (0), both variables equaled zero (0).

**1. The Package Fee Equaled Zero (0)**

The "Package Fee" was defined by the Agreement as "Package Fulfillment Fee set forth above based on the actual average number of items per package shipped during the month." See Exhibit E attached to the Bledsoe Aff. at p. 26. This equates to:

| | | | | |
|---|---|---|---|---|
| **"Package Fulfillment Fee"** | **x** | **"Actual average number of items per package shipped per month"** | **=** | **"Package Fee"** |

The "Package Fulfillment Fee" was a fee set at "$3.32 per single unit package and $.88 per each additional unit per package." See Schedule A to Exhibit E attached to the Bledsoe Aff. at 3. When zero (0) items were forecast, no packages were shipped during those months. When no packages were shipped during those months, there were no packages for items to be in. Therefore, "actual average number of items per package" was zero (0) for those respective months. Thus:

| | | | | |
|---|---|---|---|---|
| **Zero (0) ["actual average number of packages shipped per month"]** | **x** | **"Package Fulfillment Fee"** | **=** | **Zero (0) ["Package Fee"]** |

&

| | | | | |
|---|---|---|---|---|
| **Zero (0) ["Package Fee"]** | **x** | **"Minimum Packages"** | **=** | **Zero (0) ["Minimum Services Fee"]** |

By simple arithmetic, if the "actual average number of items per package" in a month was zero (0), the "Package Fee" and, therefore, the "Minimum Services Fee" equaled zero (0).

**2. "Minimum Packages" Equaled Zero (0)**

When Wal-Mart.com submitted forecasts of zero (0), not only did the "Package Fee" become zero (0) because no packages were shipped in a month, but the other multiplier in the "Minimum Services Fees" formula, "Minimum Packages" became zero (0) as well:

| | | | | |
|---|---|---|---|---|
| **"Minimum Packages"** | **x** | **"Package Fee"** | **=** | **"Minimum Services Fee"** |

"Minimum Packages" is determined by subtracting the actual number of packages shipped during the month from 75% of the "Forecast Package Volume:"

| | | | | |
|---|---|---|---|---|
| **75% of "Forecast Package Volume"** | **-** | **"actual number of packages shipped during the month"** | **=** | **"Minimum Packages"** |

After May 31, 2001, "Forecast Package Volume" was the greater of the:

> a) the number of packages estimated to be shipped as set forth in the monthly forecast submitted by the Company [Wal-Mart.com] to FBSI [Fingerhut] three (3) months immediately prior to the commencement of the subject month . . . .
>
> [or]
>
> c) with respect to each year after the expiration of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecasts submitted by Company in the month of March prior to commencement of the following one-year period.

See Exhibit E attached to the Bledsoe Aff. at 26-27.

The language in the clause makes clear that "after the expiration of the first (1st) year," Wal-Mart.com is to have "submitted" new forecasts. Thus, "Forecast Package Volume" was determined by either the three-month forecast or the most recent long-term forecast, whether it was the annual one attached to the Agreement, or the eight-month one later submitted by Wal-Mart.com.

When Wal-Mart.com sent Fingerhut forecasts with zero (0) packages filled per month, the "Minimum Packages" had to be calculated as zero (0). Under (a) or (c), the "Forecast Package Volume" would be zero (0) for the respective months. Seventy-five percent of zero (0), of course, is still zero (0). The "actual number of packages shipped during the month" would obviously have been zero (0) too. Thus,

| | | | | |
|---|---|---|---|---|
| **Zero (0) [75% of "Forecast Package Volume"]** | **-** | **Zero (0) ["actual number of packages shipped during the month"]** | **=** | **Zero (0) ["Minimum Packages"]** |

**&**

| | | | | |
|---|---|---|---|---|
| **Zero (0) [“Minimum Packages”]** | x | **Zero (0) [“Package Fee”]** | = | **Zero (0) “Minimum Services Fee”** |

Both the “Package Fee” and “Minimum Packages” were zero (0) when Wal-Mart.com submitted forecasts of zero (0) packages and stopped supplying Fingerhut with goods to package. Since both multipliers were zero (0), the “Minimum Services Fee” was necessarily zero (0) too.

## E. Fingerhut’s Interpretation Requires A Tortured Reading Of The Agreement, Which Cannot Be Sustained

As just shown, when Wal-Mart.com submitted a forecast of zero (0) and no goods were shipped, the Agreement indicates that the “Minimum Services Fee” would equal zero (0). Fingerhut’s position to the contrary is contradicted by the express terms of the Agreement.

### 1. The “Package Fee”

Fingerhut improperly defines the “Package Fee.” Fingerhut equates the “actual average number of items per package” listed in the definition of the “Package Fee” with a defined term listed in Schedule B of the Agreement, “Average number of units per parcel.” See Exhibit E attached to the Bledsoe Aff. at 18. Schedule B sets the “Average number of units per parcel” at 1.77 units per parcel. Id. These specific, contractual terms are literally different from one another. One is a planned average, the other an actual average. The only two words both terms share are “average,” “of” and “per.” Everything else about the terms is unique, and it is disingenuous for Fingerhut to imply otherwise. The “Package Fee” is to be based on actual numbers, not a projected average.

The language of the Agreement undercuts Fingerhut's argument. The "*actual* average number of items per package" listed in the definition of "Package Fee" could not be predetermined at the time the Agreement was executed. That is because it seeks the "*actual* average," not a predefined figure. "Actual" is defined as "existing in fact or reality" and "existing or occurring at the time." Merriam Webster's Collegiate Dictionary 12 (10th ed. 1997); Quotron Systems, Inc. v. Gallman, 384 N.Y.S.2d 147, 148 (N.Y. 1976) ("the meaning ascribed to a word or phrase by the lexicographers may serve as a useful guidepost" to the courts). When no packages are being shipped because of a zero (0) forecast, the average number of items per package "existing in reality" and "occurring at the time" is necessarily zero (0). It is certainly not 1.77, as Fingerhut claims.

Gary Bledsoe, of Fingerhut, admitted that Wal-Mart.com's understanding of the "Package Fee" was correct:

> Q. So would you agree with me that the package fee is calculated based on the actual average number of items per package shipped during the month?
>
> A. Yes.

See Bledsoe Dep. at p. 45-46. He further acknowledged:

> Q. Well, if there were no packages shipped during the month --
>
> A. Uh-huh.
>
> Q. -- right?
>
> A. Correct.

> Q. Then the actual number of packages shipped during the month would be zero, right?
>
> A. The actual number of packages would be zero, correct.
>
> Q. So if the actual number of packages was zero --
>
> A. Uh-huh.
>
> Q. -- the actual average number of packages would also be zero, correct?
>
> A. Yes.
>
> MR. LAINE: Objection, form and foundation.
>
> BY MR. WILSON:
>
> Q. Okay. And the package fee that is set forth that we've just discussed is used as a multiplier in the minimum payments that you allege are supposed to be made by Wal-Mart, is that right?
>
> A. Right.

See Bledsoe Dep. at p. 46-47. The "*actual* average number of items per package" was zero (0) for the disputed period.

**2. "Forecast Package Volume"**

The "Forecast Package Volume," is the other critical figure used in determining the "Minimum Services Fee." The "Forecast Package Volume" provision, as listed in its entirety on page 6 of this Memorandum is a challenging provision to comprehend. Nonetheless, its words do not support the Fingerhut argument.

Clause (c) refers to "annual forecasts" that Wal-Mart.com was to submit to replace the one attached to the Agreement. The forecast attached to the Agreement is named an "annual" forecast. Webster's defines "annual" as "covering the period of a year."

Merriam Webster's Collegiate Dictionary 47 (10th ed. 1997). The forecast attached to the Agreement lists volumes for June through May, and is described in the Agreement as "covering the period of June 2000-May 2001." See Exhibit E attached to the Bledsoe Aff., at p. 18, 29. It was "annual." It referred to a period of a year. Fingerhut offers no explanation as to how or why an "annual" forecast could, under any meaning, apply to 20 months.

Fingerhut claims that "Forecast Package Volume" is determined by the greater of clauses (a), (b) and (c), which respectively equate to three month forecasts, the annual forecast attached to the Agreement and the forecast to be later submitted by Wal-Mart.com. But the language of the provision itself requires replacing the forecast attached to the Agreement with those Wal-Mart.com would provide later:

> (c) with respect to each year after the *expiration* of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecast *submitted* by Company in the month of March prior to commencement of the following one-year period under the Agreement. (emphasis added).

Since the first year's forecast "expires," it drops out and is replaced for the "Forecast Package Volume" determination with a forecast "submitted" by Wal-Mart.com. The Agreement further indicates that the forecast attached to the Agreement has no meaning after one year because it is "annual" and only "cover[s] the period of June 2000-May 2001."

Thus, Fingerhut's argument requires whole sections of the Agreement to be disregarded and the word "annual" to be given the meaning "20 months." Such a result cannot be achieved under basic contract interpretation principles.

**F. Extrinsic Evidence Regarding the Parties' Understanding of the "Minimum Services Fee" Clause at the Time of the Agreement's Execution Demonstrates That Wal-Mart.com Properly Submitted a Forecast of Zero (0) Items per Month After the First Year of the Agreement's Term**

The evidence is overwhelming that Fingerhut and Wal-Mart.com both expected the forecast attached to the Agreement to drop off at the end of May 2001, and for Wal-Mart.com to submit a new forecast. Lee Wilwerding and John Rittenhouse, former employees who negotiated the Agreement on behalf of Wal-Mart.com, believed that the forecast attached to the Agreement was only for its first year and that Wal-Mart.com planned to submit forecasts for the remainder of the term. For instance, Wilwerding noted:

> Q. And you're aware of what that forecast is, generally?
>
> A. Those were the numbers that were developed that covered the period June of 2000 through May of 2001.

See Wilwerding Dep. at p. 37. In reviewing a document with a forecast identical to the one attached to the Agreement, sent by him to Gary Bledsoe at Fingerhut on May 26, 2000, Wilwerding noted, "this is the first series of forecast numbers and an annual forecast that I gave -- sent to Gary. It would have covered the period from June of 2000 to May of 2001." Id. at p. 76. He highlighted that Fingerhut never informed him that the attached forecast was intended to last more than a year:

> Q. Did you ever understand that this was a forecast for more than that year?
>
> A. No.
>
> Q. Did you ever have a discussion with anyone from Fingerhut where they told you that they understood this to be a forecast for more than one year?
>
> A. No.
>
> Q. Did anyone from Fingerhut ever ask you to prepare a forecast for more than a year that they told you they intended to include in the contract, the new contract?
>
> A. No.
>
> Q. If you had been asked to prepare a minimum forecast to be used in the contract for the entire period of that contract, June 2000 through January would -- what would you have done?
>
> MR. LAINE: Objection.
>
> A. Balked.
>
> Q. (By Mr. Wilson) And why would you have balked?
>
> A. Well, it -- it wouldn't -- it probably would not have been worth the paper it was printed on . . .

See Wilwerding Dep. at p. 116-17.

John Rittenhouse took over the negotiations on the Agreement for Wilwerding. He does not recall specific discussions with Fingerhut regarding the "Minimum Services Fee." See Rittenhouse Dep. at p. 37-39. Nor did anyone ever tell him that the forecast in the Agreement was for its entire term. Id. at p. 91. At the time the Agreement was finalized, he fully expected Wal-Mart.com to submit a forecast at the end of the first year. Id. at p. 39, 91.

Not only did Wal-Mart.com expect to submit additional forecasts, but numerous documents drafted by key personnel for Fingerhut unquestionably demonstrate that Fingerhut expected the same of Wal-Mart.com.

Gary Bledsoe, Fingerhut's chief negotiator for the Agreement, drafted an email dated August 2, 2000, which was just when the parties were about to execute the Agreement, telling Wal-Mart.com that, "the best way to manage minimum charges is to . . . give us the best forecast possible." See Exhibit 8 attached to the Strauss Aff.

Lisa Schleicher, Fingerhut's Account Manager for the Wal-Mart.com account, wrote an August 17, 2000 memorandum with an attached spreadsheet that was almost identical to the forecast attached to the Agreement. See Exhibit 9 attached to the Strauss Aff. Just as in the Agreement's forecast, her memorandum had a column, June through May, with identical accompanying "Monthly Annual Forecasts." Yet in her memorandum, sent soon after the Agreement was signed, the year was next to each month. Significantly, on her spreadsheet, the "Monthly Annual Forecasts" cease in May 2001, which is also the last month listed in the Agreement's forecast. June 2001 through January 2002, are then listed in the date column, but the "Monthly Annual Forecasts" corresponding to those months were left blank. At her deposition, Schleicher admitted:

> Q. You also expected Wal-Mart to provide you annual forecasts for the date starting in June 2001, correct?
>
> A. Correct.

See Deposition of Lisa M. Schleicher at p. 25, excerpts of which are attached to the Strauss Aff. as Exhibit 10. Thus, Fingerhut's Wal-Mart.com account manager expected forecasts from Wal-Mart.com for the last eight months of the Agreement.

As late as December 13, 2000, Schleicher admitted that she knew Wal-Mart.com was entitled by the Agreement to submit further forecasts. See Exhibit 11 attached to the Strauss Aff. In this email, she writes Mike Kraemer of Wal-Mart Stores, listing the forecast numbers corresponding to their respective months as in the Agreement. She then requested of Kraemer, "I also need for you to confirm for me that the forecast for the remainder of the year is as stated as such in the contract."

Michael Murray, Senior Vice President of Distribution at Fingerhut, drafted a memorandum dated August 14, 2000, for senior officials of Federated and Fingerhut. Murray acknowledged that "Wal-Mart has provided a volume forecast for the *first 12 months* of the contract" (emphasis added), and added that "Wal-Mart *must provide annual forecasts* as well as 3 month rolling forecasts" (emphasis added). See Exhibit 12 attached to the Strauss Aff.

Fingerhut undoubtedly expected Wal-Mart.com to submit a forecast to replace the one attached to the Agreement. The Bledsoe, Murray and Schleicher documents and testimony are clear admissions that Fingerhut did not think that the forecast attached to the Agreement would be effective for the entire term of the Agreement.

### G. By Suspending Fulfillment at the Western Distribution Center, Wal-Mart.com Did Not Terminate the Agreement

In 2001, with slow internet sales, with knowledge that Fingerhut was ceasing its third-party fulfillment services and with its own proprietary fulfillment facilities coming on-line, Wal-Mart.com took advantage of the Agreement's flexibility and submitted a forecast of zero (0) beginning in August 2001. It did not terminate the Agreement. Although the "Minimum Services Fee" equaled zero (0), the Agreement was still in operation.

Every month of the Agreement's term, including from August 2001 through January 2002, Wal-Mart.com paid Fingerhut the $7500.00 "Account Management Fee." See Exhibit E attached to the Bledsoe Aff. at p 25. This "Account Management Fee" was fixed, and Wal-Mart.com paid it until the Agreement terminated on January 31, 2002.

Fingerhut could have negotiated to have the "Minimum Services Fee" as a fixed, guaranteed amount too, but it chose to base it on volume instead. If Fingerhut had wanted to have "Minimum Services Fees" above $0, it certainly knew how to draft such a clause, as shown by the Account Management Fee.

### H. Wal-Mart.com Was Not Required to "Meet and Confer" With Fingerhut Regarding the New Forecast, and to the Extent it was Required, it Did.

Fingerhut argues that Wal-Mart.com failed to "meet and confer" regarding pricing after the end of the first year. See Exhibit E to the Bledsoe Aff. at p. 4. Such an argument is a red herring because this dispute is not about pricing. It is about forecasts and interpretation of the "Minimum Service Fee." In addition, the burden was on both parties to "meet and confer," not just Wal-Mart.com. And, to the degree this dispute is about pricing, the parties did "meet and confer." From January 2001, until this action was commenced, Wal-Mart.com made numerous oral and written contacts with Fingerhut to resolve the dispute. See Rittenhouse Dep. at 72-73, 75-77, 83-86 and 90. As such, it met any "meet and confer" requirements.

### I. The "Minimum Services Fee," as Interpreted by Fingerhut, Constitutes a Penalty

In its Memorandum, Fingerhut interprets the "Minimum Services Fee" as a liquidated damages clause. Under New York law:

> Liquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract. In effect, a liquidated damages provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement. Parties to a contract have the right to agree to such clauses, provided that the clause is neither unconscionable nor contrary to public policy.

Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc., 393 N.Y.S.2d 365, 368-69 (1977) (internal citations omitted).

A liquidated damage clause is unenforceable as a penalty if it requires "payment of a sum of money grossly disproportionate to the amount of actual damages." Id. at 424; see also Clubb v. ANC Heating & Air Conditioning, Inc., 675 N.Y.S.2d 176 (N.Y. App. Ct. 1998) (penalty of $72,800 for actual loss of $1500 was "grossly disproportionate" to the loss and constituted a penalty). "In determining the enforceability of a liquidated damages clause, courts should consider 'the surrounding circumstances and the apprehension of damage that existed in the minds of the parties at the time the contract was made.'" LeRoy v. Sayers, 635 N.Y.S.2d 217, 222 (N.Y. App. Ct. 1995), quoting, 36 NY Jur. 2d, Damages 156, at 267). Significantly, "where there is doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause, it should be resolved in favor of a construction which holds the provision to be a penalty." Pyramid Centres and Co. Ltd. v. Kinney Shoe Corp, 663 N.Y.S.2d 711, 713 (App. Div. 1977) (internal citation omitted).[2]

[2] Fingerhut asserts, without any citation, that a penalty is a "stipulated sum," implying that it cannot be an amount later calculated. This is not true. Many cases have found penalties where the contract contained a formula for determining damages or fees. See Pyramid Centres663 N.Y.S.2d 711 at 713 (penalty declared when damages calculated as greater of average annual rent or double rent); Willner v. Willner, 538 N.Y.S.2d 599, 603 (N.Y. App. Div. 1989) (penalty when formula for one missed maintenance payment calculated retroactively at $110 per week, resulted in $54,750 charge). Even if Fingerhut's unsupported assertion were true, according to Fingerhut's reading of the Agreement, the amount Wal-Mart.com owed was not based upon a formula but was already fixed at the time of the Agreement's execution at $3.2 million.

By Fingerhut's interpretation, it and Wal-Mart.com agreed in August 2000, that if Wal-Mart.com ceased using Fingerhut's services in August 2001, Wal-Mart.com would be in breach and Fingerhut would be entitled to $3.2 million in liquidated damages. As explained throughout this Memorandum, Wal-Mart.com vigorously denies that it breached the Agreement. The Agreement allowed for submission of forecasts of zero (0) goods after the first year, and Wal-Mart.com continued to perform, as demonstrated by payment of the monthly "Account Management Fee."

Even if Wal-Mart.com had breached, the sum is "grossly disproportionate" to any actual damages suffered by Fingerhut. Fingerhut has not submitted even a scintilla of evidence demonstrating how $3.2 million relates to its damages. In fact, what has been presented indicates that Fingerhut's actual damages were much lower. Fingerhut admits that most of its losses related to its relationship with Wal-Mart and Wal-Mart.com were labor related. See Bledsoe Dep. at 9. As for ramp-up costs such as hiring and training new personnel, Wal-Mart.com paid for those expenses when they occurred as part of the Agreement.

In fact, Fingerhut understood it would receive a windfall if Wal-Mart.com's orders were less than in the forecast attached to the Agreement. Michael Muarry, Fingerhut's Senior Vice President of Operations, explained as much in an August 14, 2000 memorandum, "[o]bviously, we have some upside if Wal-Mart falls short of their forecast, and we reduce staff, yet collect minimum fees." See Exhibit 12 attached to the

Strauss Aff. At his deposition, Murray further admitted that reduced labor costs in that scenario would be a boon for Fingerhut:

> Q. But you were thinking that if Wal-Mart fell short of the forecast, you had a reduced staff, you collect the minimum fees, that that would be an upside for you, right?
>
> A. Yes.

See Deposition of Michael Murray at p. 54, excerpts of which are attached to the Strauss Aff. as Exhibit 13.

As evidence of his understanding, Murray attached to his memorandum, a comparison of costs based on different volumes over a one year period. The figures in this comparison were based on the forecast attached to the Agreement. Murray's analysis shows $5.4 million in variable costs per year. (calculated by subtracting $1.8 million in postage costs from $7.2 million variable costs.) If this is divided in half (the six months Wal-Mart.com submitted a forecast of zero (0) goods), the result is $2.7 million in variable costs. If this number is subtracted from $3.2 million the result is $500,000. It is easy to see that Fingerhut is claiming entitlement to a $2.7 million windfall, since these costs would not be incurred if no packages were processed. See Exhibit 12 to the Strauss Aff. Fingerhut's actual damages were more like $500,000.00, not anywhere close to what it claims to be owed. The amount it seeks is a penalty, unenforceable under New York law.

## CONCLUSION

The language of the Fulfillment Services Agreement cannot support Fingerhut's construction. Reading whole clauses out of the Agreement and giving words and phrases contorted, nonsensical meaning is not proper contract interpretation methodology. It is clear that the Agreement permitted Wal-Mart.com to submit a forecast of zero (0) packages for the period August 2001 through January 2002. Moreover, what is expressed by the words of the Agreement is made certain by the evidence that all parties believed a new forecast would be submitted by Wal-Mart.com at the time the Agreement was signed.

Fingerhut's motion for summary judgment must be denied.

Date: April 10, 2002

DORSEY & WHITNEY LLP

By Perry M. Wilson, III

Perry M. Wilson III (#12302X)
Jonathan A. Strauss (#279602)
Pillsbury Center South
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600

Attorneys for Defendant Wal-Mart.com, Inc.