UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Fingerhut Business Services, Inc.,

Plaintiff,

v.

Wal-Mart.com, Inc.,

Defendant.

Civil File No. 01-CV-1261 JNE/JSM

**WAL-MART.COM, INC.'S TRIAL BRIEF**

## INTRODUCTION

This dispute is a product of the internet bubble that fixated the nation in the late 1990's. Companies scrambled to create websites to sell products and many others tried to find ways to provide services and support to e-commerce. Wal-Mart Stores, Inc. ("Wal-Mart") and Fingerhut[1] both wanted to enter the world of e-commerce. Wal-Mart and Fingerhut entered into two contracts, one of which is in dispute.

Pursuant to the agreements, Fingerhut would provide storage, picking, and shipping of product from Wal-Mart's on-line shopping website to customers. Approximately half-way through the term of the second contract, a dispute arose about the interpretation of the "Minimum Services Fees" provision of the contract. Wal-Mart believes that the language of the agreement not only allowed, but, required Wal-Mart to submit a new forecast for June 2001 through January 2002. In accordance with its duty

[1] As described in Wal-Mart.com's Motion in Limine, based on its Rule 7.1 Disclosure Statement, Fingerhut is no longer the owner of this claim and is not the real party in interest under Rule 17. By its motion, Wal-Mart requests that the plaintiff be changed to CF Companies, Inc.

to provide a forecast, Wal-Mart provided a forecast for the months of June 2001 through January 2002. For August 2001 through January 2002, Wal-Mart forecast that it would not be shipping any packages through Fingerhut. Fingerhut sued Wal-Mart. Fingerhut's claims are based upon a strained interpretation of the agreement and a revisionist history of the facts. Fingerhut's overblown damages claim is seriously flawed. It claims to be entitled to the full contract price without the need to subtract the costs of performing the service and mitigating its damages. This is directly contrary to the contractually-chosen New York damages law.

## FACTS

This dispute is over whether the terms of the Fulfillment Services Agreement, effective June 1, 2000 ("Agreement"), permit Wal-Mart.com to submit a forecast of zero (0) packages for the period August 1, 2001 through January 31, 2002, the end of the contract term.

### A. The 1999 Fulfillment Services Agreement

In 1999, Wal-Mart executed a Fulfillment Services Agreement ("1999 Agreement") to fill its internet orders with Fingerhut, a subsidiary of Federated Department Stores. Under the 1999 Agreement, after Wal-Mart's website received internet orders, the orders were picked, packaged and shipped from Fingerhut's Western Distribution Center in Utah. Although both parties had high expectations, on-line internet shopping was a recent innovation, creating much uncertainty regarding the relationship's overall success.

**B. Third-Party Fulfillment of E-Commerce Orders Was a New Business for All Concerned**

Internet shopping and third-party fulfillment were new businesses for both Wal-Mart and Fingerhut. Fingerhut completed construction of the Western Distribution Center in 1996, and it measured over one million square feet. Fingerhut became involved in third-party fulfillment in 1997 when it created the entity Fingerhut Business Services. The Western Distribution Center was vacant until 1999 when Fingerhut Business Services' first substantial customer, Etoys, Inc. moved in.

Forecasting volumes for a newly launched e-commerce business, like Wal-Mart.com, proved to be very challenging. At that time, there were no known models or profiles that Wal-Mart could rely on in forecasting its volume. This created a high risk that was not unique to Wal-Mart, but rather, was ubiquitous in the new internet shopping industry as evidenced by the dot com crash. Forecasting for Wal-Mart and Fingerhut was especially difficult because Wal-Mart's website was revamped early in the relationship. The parties both knew that any type of forecast would be based on speculation and conjecture.

Wal-Mart understood that it could not just create a website and hope for business. It knew that it needed to advertise and establish a reputation. Until it could do those things, it would not be very accurate in forecasting volumes.

**C. The 2000 Fulfillment Services Agreement**

In early 2000, at Fingerhut's request, the parties commenced negotiations for a new Fulfillment Services Agreement (the "Agreement"). Wal-Mart.com was created in

late 1999, so it became the party to the new contract with Fingerhut. The Agreement was executed in August 2000, and considered effective on June 1, 2000. Initially, the parties had been negotiating over a one year agreement but eventually agreed on a 20 month term to end on January 31, 2002. The Agreement provided for automatic annual renewal after the first 20 month term, unless it were terminated in accordance with the applicable provisions.

Wal-Mart.com agreed to cover ramp-up costs for Fingerhut, paying for training, labor and retention expenses separately as these expenses were incurred. These ramp up costs would increase for larger forecasts. The Agreement also required Wal-Mart.com to pay a monthly $7500.00 “Account Management Fee.”

Fingerhut tried to negotiate guaranteed monthly minimum payments, but Wal-Mart.com would not agree. As part of the negotiations, Wal-Mart.com eventually agreed to a “Minimum Services Fee.” The “Minimum Services Fee” was determined by either 1) comparing the number of packages shipped in a month to the number of store keeping units (“SKUs”) or by 2) comparing the number of packages shipped in a month to the forecasted volume. Only the second option is relevant in this dispute, because by August 2001, there were no SKUs at the fulfillment center.

Under this second option, the “Minimum Services Fee” was determined by multiplying the “Package Fee” by the “Minimum Packages:”

| | | | | |
|---|---|---|---|---|
| **“Package Fee”** | **x** | **“Minimum Packages”** | **=** | **“Minimum Services Fee”** |

The "Package Fee" is "the applicable Package Fulfillment Fee set forth above based on the *actual* average number of items per package shipped during the month." (emphasis added). The "Minimum Packages" was determined by subtracting the "actual number of packages shipped during the month" from 75% of the "Forecast Package Volume:"

| | | | | |
|---|---|---|---|---|
| **75% of "Forecast Package Volume"** | **-** | **"actual number of packages shipped during the month"** | **=** | **"Minimum Packages"** |

The Agreement continued:

> The term "Forecast Package Volume" shall mean the greater of the (a) number of packages estimated to be shipped as set forth in the monthly forecast submitted by Company [Wal-Mart.com] to FBSI [Fingerhut] three (3) months immediately prior to the commencement of the subject month or (b) the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company upon execution of this Agreement and attached hereto or (c) with respect to each year after the expiration of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company in the month of March prior to commencement of the following one-year period under the Agreement.

See Agreement, Schedule A.

**D. Fingerhut's Problems at the Western Distribution Center Did Not Stem From Wal-Mart.com**

Fingerhut alleges that the Western Distribution Center was "largely dedicated to Wal-Mart's business" and that Wal-Mart.com was using "valuable warehouse space." This simply was not true. During the 1999 Christmas season, Fingerhut's primary customer at the Western Distribution Center was Etoys. In fact, approximately 80% of

the building's fulfillment that season was dedicated to Etoys, with the remaining 20% split among Wal-Mart.com and a few other customers. Put another way, that season, Fingerhut was filling thousands of Etoys orders per day at the same time it was filling just hundreds of Wal-Mart.com orders. Nonetheless, Wal-Mart Stores', and later Wal-Mart.com's contracts with Fingerhut included payments for the use of space.

Fingerhut's real problems in 1999 and early 2000 actually derived from other sources. Fingerhut had many operational and management problems at the Western Distribution Center. Fingerhut fell behind in filling a large number of its orders. Orders shipped by Fingerhut often contained the wrong items, and, Wal-Mart.com's customers sometimes found E-toys literature in their packages. Fingerhut also overstaffed the Western Distribution Center, making it unprofitable and difficult to run.

Etoys exited the Western Distribution Center in early 2000, and the parties went to arbitration because Fingerhut had failed to meet a number of contractual performance standards with respect to the speed and accuracy of the fulfillment. The arbitration panel held in favor of Etoys, and the United States District Court for the District of Minnesota upheld the award of $2,512,202. See Fingerhut Business Services, Inc. v. Etoys, Inc., 2001 WL 1640075, at *7 (D. Minn. Sept. 6, 2001) (unpublished).

Although Wal-Mart's on-line orders during the 1999 Christmas season missed expectations, Gary Bledsoe, of Fingerhut, acknowledged that Wal-Mart did not intend to provide a faulty forecast. Fingerhut now claims to have lost at least $2,000,000 under the 1999 Agreement, and a great majority of these losses apparently stem from labor

expenses. Fingerhut has implied that the 2000 Agreement was negotiated with the idea that this loss would be recouped. Although Wal-Mart Stores had been informed that the 1999 Agreement was not profitable for Fingerhut, Fingerhut did not inform Wal-Mart of the extent of its losses until this litigation.

**E. Wal-Mart.com's Forecasts for June 2001 – January 2002**

In October 2000, Tom Cole, a senior official of Federated, Fingerhut's parent corporation, informed John Rittenhouse, the Chief Logistics Officer of Wal-Mart.com, that Fingerhut would be exiting the third-party fulfillment business and closing its Western Distribution Center in 2002. For some time, Wal-Mart.com had been reviewing its fulfillment strategy, and it had decided that it needed fulfillment facilities located east of Utah. When Wal-Mart began negotiating the 1999 Agreement, it informed Fingerhut that it planned to open its own fulfillment facilities by 2002. Thus, before the Agreement was signed in August 2000, Fingerhut knew that Wal-Mart would ultimately take over its own fulfillment operations. Fingerhut was also aware that it was not the exclusive fulfiller for Wal-Mart.com under the 2000 Agreement, rather that it was a provider of fulfillment services for Wal-Mart.

When Cole informed Rittenhouse that Fingerhut was ceasing third-party fulfillment, Wal-Mart.com decided to vacate the Western Distribution Center before January 31, 2002. Fingerhut's exit posed strategic challenges for Wal-Mart. Wal-Mart.com needed a stable, predictable fulfillment strategy which was not available from Fingerhut in the long-term. In addition, the announcement in 2000 made it highly likely

that Fingerhut's experienced employees would look for other employment before the Christmas season in 2001, making it very likely that this high volume period would be very difficult for Fingerhut to staff with a competent work force. Pursuant to the Agreement, in the spring of 2001, Wal-Mart.com submitted a forecast phasing out its use of the facility. For the months of August 2001 through January 2002, the new forecast projected zero (0) parcels shipped.

## ARGUMENT

### A. Wal-Mart Did Not Breach the 2000 Fulfillment Services Agreement.

#### 1. The Agreement is Governed by New York Law.

Under New York law, the Court should give effect to the mutual intention of the parties at the time of contracting. See Reiss v. Financial Performance Corp., 715 N.Y.S.2d 29, 34 (N.Y. App. Div. 2000) ("the essence of proper interpretation . . . is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract."). The parties' intention should be derived from the language employed in the four corners of the agreement. See Transmedia Restaurant Co., Inc. v. 33 E. 61st Street Restaurant Corp., 710 N.Y.S.2d 756, 761 (N.Y. App. Div. 2000); W.W.W. Associates, Inc. v. Giancontieri et al., 565 N.Y.S.2d 440, 443 (N.Y. App. Div. 1990). However, if there is an ambiguity in the terminology used, or where there are internal inconsistencies pointing to an ambiguity, extrinsic evidence is admissible to determine the parties' intent. See Ruttenberg v. Davidge Data Systems Corp., et al., 626 N.Y.S.2d 174, 178 (N.Y. App.

Div. 1995) (admitting parol evidence and denying summary judgment where the parties' intent was not clear from the four corners of the agreement); Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (N.Y. App. Div. 1999) (finding internal inconsistencies within a contract made the agreement ambiguous and allowing the examination of extrinsic evidence). This Court has found that the Minimum Services Fee provisions of the Agreement are ambiguous. See Order on Plaintiff's Motion For Summary Judgment, December 9, 2002. The facts will show that Wal-Mart.com's interpretation of the Agreement is correct.

**2. The Agreement Required Wal-Mart to Submit a New Forecast Beginning June 2001**

The Agreement required Wal-Mart to submit a new forecast for the months of June 2001 through January 2002. See Agreement, Schedule A, Minimum Services Fees, and Schedule B. The Agreement required a second annual forecast to allow Fingerhut to adequately plan for its labor needs and for purposes of determining any minimum service fees. The Minimum Services Section provided that minimum service fees would be determined either by comparing the actual packages shipped to either 1) the number of SKU's in inventory or 2) one of three possible forecasts. Under the forecast method for determining minimum service fees, sections (b) and (c) discussed the annual forecasts which would be used to calculate the minimum service fee due, if any. The Agreement states

> The term "Forecast Package Volume" shall mean the greater of the (a) . . . or (b) the number of packages estimated to be shipped in the subject month as set forth in the annual

> forecast submitted by Company [Wal-Mart] upon execution of this Agreement and attached hereto or (c) *with respect to each year after the expiration of the first (1st) year*, the number of packages estimated to be shipped in the subject month *as set forth in the annual forecast submitted by Company in the month of March prior to commencement of the following one-year period* under the Agreement.

See Agreement, Schedule A, Minimum Services Fees. The Agreement clearly requires two annual forecasts, the first annual forecast for June 2000 through May 2001 (this annual forecast was attached to Schedule A) and the second annual forecast from June 2001 through the remainder of the contract. The second annual forecast was to be submitted in the month of March prior to the commencement of the following one-year period. The parties later agreed that Wal-Mart could submit the forecast in April of 2001.

Schedule B also notes that the forecast attached to Schedule A only covered the period of June 2000 through May 2001. See Agreement, Schedule B.

The Agreement does not require Wal-Mart to submit a forecast for June 2001 through January 2002 with higher projected volumes than the projected volumes for the previous year. In fact, the Agreement places no restrictions on the volume forecasts for June 2001 through January 2002, and Wal-Mart was free to submit any forecast, including a forecast of zero.

In accordance with the Agreement, Wal-Mart submitted a forecast for the remaining term of the Agreement, June 2001 through January 2002, in April of 2001. The forecast for the months of August 2001 through January 2002 was zero. Wal-Mart acted in accordance with the Agreement and in no way breached the Agreement by

providing a forecast for June 2001 through January 2002 that included a forecast of zero for six months.

**3. The Parties Contemplated that Wal-Mart would Submit a Forecast For June 2001 Through January 2002.**

Both Fingerhut and Wal-Mart expected that Wal-Mart would submit a new forecast for June 2001 through January 2002. The Wal-Mart employees who negotiated the Agreement on behalf of Wal-Mart believed that the forecast attached to the Agreement was only for the first year of the Agreement. They understood that Wal-Mart would submit a new forecast in March 2001. During the negotiations, no one discussed the possibility that the "annual" forecast would last for more than one year.

Fingerhut also expected Wal-Mart to submit a new forecast for June 2001 through January 2002. When negotiating the Agreements, the parties agreed that it would take Fingerhut about three months notice to plan for labor to meet Wal-Mart's projections, so the Agreement required Wal-Mart to provide Fingerhut with 90-day rolling forecasts in addition to the annual forecasts. The Agreement also provided that the second annual forecast would be submitted in March to allow it three months to adequately plan for June's labor requirements.

In August, after the Agreement was signed, Lisa Schliecher of Fingerhut provided Wal-Mart with a chart which showed all twenty months of the contract and noted the due dates of the rolling 90 day forecasts. This chart had annual forecast volumes filled in for the first year, but the months from June 2001 through January 2002 were blank.

Ms. Schliecher has testified that she expected Wal-Mart to provide a new forecast beginning June 2001.

Fingerhut's internal correspondence even demonstrates that it expected to receive a forecast for June 2001 through January 2002. Michael Murray, Senior Vice President of Distribution at Fingerhut, drafted a memorandum dated August 14, 2001, for senior officials of Federated and Fingerhut. Murray acknowledged that "Wal-Mart has provided a volume forecast for the first 12 months of the contract," and added that "Wal-Mart must provide annual forecasts as well as 3-month rolling forecasts."

The evidence will demonstrate that both parties expected that Wal-Mart would provide a new forecast for the remaining term of the Agreement. They expected Wal-Mart to do so because it was required to do so pursuant to the Agreement. Therefore, Wal-Mart did not breach the contract by providing a new forecast for June 2001 through January 2002 which forecast volumes of zero packages shipped for August 2001 through the January 2002.

### 4. Under the Agreement, When Wal-Mart.com Submitted a Forecast of Zero (0), the "Minimum Services Fee" Equaled Zero (0)

The "Minimum Services Fee" was determined by multiplying "Minimum Packages" by the "Package Fee:"

**"Minimum Packages"** **x** **"Package Fee"** = **"Minimum Services Fee"**

Since both variables, the "Minimum Packages" and the "Package Fee," were multipliers, if either one equaled zero (0), the "Minimum Services Fee" equaled zero (0). As will be shown, when Wal-Mart submitted forecasts of zero (0), both variables equaled zero (0).

**a. The Package Fee Equaled Zero (0)**

The "Package Fee" was defined by the Agreement as "Package Fulfillment Fee set forth above based on the actual average number of items per package shipped during the month." See Agreement, Schedule A. This equates to:

| | | | | |
|---|---|---|---|---|
| **"Package Fulfillment Fee"** | **x** | **"Actual average number of items per package shipped per month"** | **=** | **"Package Fee"** |

The "Package Fulfillment Fee" was a fee set at "$3.32 per single unit package and $.88 per each additional unit per package." See Agreement, Schedule A. From August 2001 through January 2002, no packages were shipped pursuant to the forecast. Packages are comprised of items, so when no packages were shipped, no items were shipped. Therefore, the "actual average number of items per package" was zero (0) for the final six months of the Agreement. Thus:

| | | | | |
|---|---|---|---|---|
| **Zero (0) ["actual average number of packages shipped per month"]** | **x** | **"Package Fulfillment Fee"** | **=** | **Zero (0) ["Package Fee"]** |

&

| | | | | |
|---|---|---|---|---|
| **Zero (0) ["Package Fee"]** | **x** | **"Minimum Packages"** | **=** | **Zero (0) ["Minimum Services Fee"]** |

By simple arithmetic, if the "actual average number of items per package" in a month was zero (0), the "Package Fee" and, therefore, the "Minimum Services Fee" equaled zero (0).

**b. "Minimum Packages" Equaled Zero (0)**

When Wal-Mart.com submitted forecasts of zero (0), not only did the "Package Fee" become zero (0) because no packages were shipped in a month, but the other multiplier in the "Minimum Services Fees" formula, "Minimum Packages" became zero (0) as well:

| | | | | |
|---|---|---|---|---|
| **"Minimum Packages"** | **x** | **"Package Fee"** | **=** | **"Minimum Services Fee"** |

"Minimum Packages" is determined by subtracting the actual number of packages shipped during the month from 75% of the "Forecast Package Volume:"

| | | | | |
|---|---|---|---|---|
| **75% of "Forecast Package Volume"** | **-** | **"actual number of packages shipped during the month"** | **=** | **"Minimum Packages"** |

After May 31, 2001, "Forecast Package Volume" was the greater of the:

> a) the number of packages estimated to be shipped as set forth in the monthly forecast submitted by the Company [Wal-Mart.com] to FBSI [Fingerhut] three (3) months immediately prior to the commencement of the subject month . . . .
>
> [or]
>
> c) with respect to each year after the expiration of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecasts submitted by Company in the month of March prior to commencement of the following one-year period.

See Agreement, Schedule A.

The language in the clause makes clear that in March of the first year, Wal-Mart.com was required to submit a new forecast for the remainder of the term. Thus, the "Forecast Package Volume" was determined by either the three-month forecast or the most recent long-term forecast, whether it was the annual one attached to the Agreement, or the eight-month one later submitted by Wal-Mart.com.

When Wal-Mart.com sent Fingerhut forecasts with zero (0) packages filled per month, the "Minimum Packages" equaled zero (0). Under (a) or (c), the "Forecast Package Volume" was zero (0) for the respective months. Seventy-five percent of zero (0), of course, is still zero (0). The "actual number of packages shipped during the month" was obviously zero (0) too. So,

| | | | | |
|---|---|---|---|---|
| **Zero (0) [75% of "Forecast Package Volume"]** | **-** | **Zero (0) ["actual number of packages shipped during the month"]** | **=** | **Zero (0) ["Minimum Packages"]** |

**&**

| | | | | |
|---|---|---|---|---|
| **Zero (0) ["Minimum Packages"]** | **x** | **Zero (0) ["Package Fee"]** | **=** | **Zero (0) "Minimum Services Fee"** |

Both the "Package Fee" and "Minimum Packages" were zero (0) when Wal-Mart.com submitted forecasts of zero (0) packages and stopped supplying Fingerhut with goods to package. Since both multipliers were zero (0), the "Minimum Services Fee" was necessarily zero (0) too.

Thus, for August 2001 through January 2002, the months when Wal-Mart forecast shipping zero (0) packages and actually shipped zero (0) packages, the minimum services fee due to Fingerhut is zero (0).

### 5. The Language of the Agreement Does Not Support Fingerhut's Interpretation of the Minimum Services Fees Provision

As just shown, when Wal-Mart.com submitted a forecast of zero (0) and no goods were shipped, the Agreement indicates that the "Minimum Services Fee" would equal zero (0). Fingerhut's position to the contrary is contradicted by the express terms of the Agreement.

#### a. The "Package Fee"

Fingerhut improperly defines the "Package Fee." Fingerhut equates the "actual average number of items per package" listed in the definition of the "Package Fee" with a defined term listed in Schedule B of the Agreement, "Average number of units per parcel." See Agreement, Schedule B. Schedule B sets the "Average number of units per parcel" at 1.77 units per parcel. Id. These specific, contractual terms are literally different from one another. One is a planned average, the other an actual average. The terms are unique, and it is disingenuous for Fingerhut to imply otherwise. The "Package Fee" is to be based on actual numbers, not a projected average.

The language of the Agreement undercuts Fingerhut's argument. The "*actual* average number of items per package" listed in the definition of "Package Fee" could not be predetermined at the time the Agreement was executed. That is because it seeks the "*actual* average," not a predefined figure. "Actual" is defined as "existing in fact or

reality" and "existing or occurring at the time." Merriam Webster's Collegiate Dictionary 12 (10th ed. 1997); Quotron Systems, Inc. v. Gallman, 384 N.Y.S.2d 147, 148 (N.Y. 1976) ("the meaning ascribed to a word or phrase by the lexicographers may serve as a useful guidepost" to the courts). When no packages are being shipped because of a zero (0) forecast, the average number of items per package "existing in reality" and "occurring at the time" is necessarily zero (0). It is certainly not 1.77, as Fingerhut claims.

Fingerhut employees have even admitted that Wal-Mart.com's understanding of the "Package Fee" was correct. One Fingerhut employee stated that if no packages were shipped during a month then the actual number of packages shipped during the month would be zero and the actual average number of packages would also be zero. So, the actual average number of items per package for the disputed months is zero (0).

**b. "Forecast Package Volume"**

The "Forecast Package Volume," is the other critical figure used in determining the "Minimum Services Fee." The "Forecast Package Volume" provision, as listed in its entirety on page 6 of this Memorandum is a challenging provision to comprehend. Nonetheless, its words do not support the Fingerhut argument.

Clause (c) refers to "annual forecasts" that Wal-Mart.com was to submit to replace the one attached to the Agreement. The forecast attached to the Agreement is named an "annual" forecast. Webster's defines "annual" as "covering the period of a year." Merriam Webster's Collegiate Dictionary 47 (10th ed. 1997). The forecast attached to the

Agreement lists volumes for June through May, and is described in the Agreement as "covering the period of June 2000-May 2001." See Agreement, Schedule B. It was "annual." It referred to a period of a year. Fingerhut offers no explanation as to how or why an "annual" forecast could, under any meaning, apply to 20 months.

Fingerhut claims that "Forecast Package Volume" is determined by the greater of clauses (a), (b) and (c), which respectively equate to three month forecasts, the annual forecast attached to the Agreement and the forecast to be later submitted by Wal-Mart.com. But the language of the provision itself requires replacing the forecast attached to the Agreement with those Wal-Mart.com would provide later:

> (c) with respect to each year after the *expiration* of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecast *submitted* by Company in the month of March prior to commencement of the following one-year period under the Agreement. (emphasis added).

Since the first year's forecast "expires," it drops out and is replaced with a forecast "submitted" by Wal-Mart.com for the "Forecast Package Volume" determination. The Agreement further indicates that the forecast attached to the Agreement has no meaning after one year because it is "annual" and only "cover[s] the period of June 2000-May 2001."

Thus, Fingerhut's argument requires whole sections of the Agreement to be disregarded and the word "annual" to be given the meaning "20 months." Such a result cannot be achieved under basic contract interpretation principles.

### 6. By Suspending Fulfillment at the Western Distribution Center, Wal-Mart.com Did Not Terminate the Agreement

In 2001, with slow internet sales, with knowledge that Fingerhut was ceasing its third-party fulfillment services and with its own proprietary fulfillment facilities coming on-line, Wal-Mart.com took advantage of the Agreement's flexibility and submitted a forecast of zero (0) beginning in August 2001. It did not terminate the Agreement. Although the "Minimum Services Fee" equaled zero (0), the Agreement was still in operation.

Every month of the Agreement's term, including from August 2001 through January 2002, Wal-Mart.com paid Fingerhut the $7500.00 "Account Management Fee." See Agreement. This "Account Management Fee" was fixed, and Wal-Mart.com paid it until the Agreement terminated on January 31, 2002.

Fingerhut could have negotiated to have the "Minimum Services Fee" as a fixed, guaranteed amount too, but it chose to base it on volume instead. If Fingerhut had wanted to have "Minimum Services Fees" above $0, it certainly knew how to draft such a clause, as shown by the Account Management Fee.

## B. Wal-Mart Did Not Breach the Agreement, But Even If It Did, Fingerhut Is Not Entitled To The Damages Which It Claims.

### 1. If Wal-Mart Breached the Agreement, Fingerhut Has Failed To Properly Calculate Its Damages.

It is axiomatic that the plaintiff bears the burden of proving its damages, and its failure to do so is fatal to its cause of action. See, J.R. Loftus, Inc. v. White, et al., 85

N.Y.2d 874 (N.Y. 1995); Alpha Auto Brokers, Ltd., et al. v. Continental Insurance Co., et al., 286 A.D.2d 309 (N.Y.App.Div. 2001).

In a breach of contract case, the proper measure of damages is expectancy damages or, put another way, the expected profit. See J.R. Loftus, Inc. v. White, et al., 85 N.Y.2d at 877; Oneonta Dress Co., Inc. v. Ozona-USA, Inc., 503 N.Y.S.2d 167, 169 (N.Y.App.Div. 1986). Expectancy damages are calculated by subtracting what it would have cost the plaintiff to perform or fulfill the contract from what the purchaser agreed to pay. See Oswego Falls Pulp and Paper Co. v. Stecher Lithographic Co., 215 N.Y. 98, 105 (N.Y. 1915) ("The only means of ascertaining the loss which the [plaintiff] sustains is to ascertain what it would have cost him to have fulfilled his contract and deduct that from what the [defendant] agreed to pay."); Oneonta Dress Co., Inc. v. Ozona-USA, Inc., 503 N.Y.W.2d at 169 ("Lost profit damages … were assessed by subtracting saved labor and overhead costs from the gross revenues expected on the contract").

Here, Fingerhut claims that it is entitled to the entire amount that it believes Wal-Mart was obligated to pay. This argument is in direct contraction to the law on damages. Fingerhut is, at most, entitled to expectancy or lost profit damages. Lost profit damages are determined by subtracting the cost to perform, such as labor and overhead, from the amount that Wal-Mart would have paid Fingerhut under this Agreement. Therefore, even assuming that Fingerhut is entitled to use the volume forecast for the previous year, which it is not, Fingerhut would still have to subtract its cost to perform,

i.e., labor costs, postage, and overhead. Fingerhut has failed to subtract its cost to perform, and because of its failure to do so, its damage calculation is improper.

**2. Fingerhut Has A Duty To Mitigate Its Damages**

Fingerhut's damage calculations do not account for its duty to mitigate. A party seeking damages has a duty to make reasonable efforts to avoid the consequences or minimize the injury of a breach of contract. See Wilmot v. State of New York, 344 N.Y.W.2d 350, 352-53 (N.Y. 1973) ("[T]here rests on a party seeking damage the active duty of making reasonable exertions to render the injury as light as possible *** the party seeking damages is under the duty to make a reasonable effort to avoid consequences of the act complained of.") Holy Properties Ltd., L.P. v. Kenneth Cole Properties, Inc., 637 N.Y.S.2d 964 (N.Y. 1995). In fact, "[n]o recovery may be had for losses which the person injured might have prevented by reasonable efforts and expenditures." Wilmot v. State of New York, 344 N.Y.S.2d at 353.

Fingerhut had a duty to mitigate its damages; it could not simply sit back and allow itself to be injured, or worse, it could not contribute to its own injury, but that is exactly what Fingerhut did. It made no reasonable effort to avoid injury, and in fact, it contributed to its own injury. How? First, it failed to go to the marketplace and look for cover for the upcoming holiday season. Second, it injured itself by announcing to the marketplace in October of 2000 that it was closing the Utah Fulfillment Center and exiting the third-party fulfillment services business. Fingerhut created its own impediment to alternative contracts. It cannot be allowed to profit from its self-imposed

situation. To allow it to do so would be analogous to allowing an employee to claim damages based on wrongful termination when the employee hindered his own ability to get another job, for instance by getting thrown in jail. No court would allow an employee to collect damages for wrongful termination when the employee failed to mitigate his damages by getting thrown in jail. The situation is the same here. Fingerhut claims damages for breach of contract, but Fingerhut failed to mitigate its damages, and in fact, further injured itself by announcing that its facility was closing. It cannot profit from its own failure to mitigate.

### 3. The "Minimum Services Fee," as Interpreted by Fingerhut, Constitutes a Penalty

Fingerhut interprets the "Minimum Services Fee" as a liquidated damages clause. Under New York law:

> Liquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract. In effect, a liquidated damages provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement. Parties to a contract have the right to agree to such clauses, provided that the clause is neither unconscionable nor contrary to public policy.

Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc., 393 N.Y.S.2d 365, 368-69 (N.Y. 1977) (internal citations omitted).

A liquidated damage clause is unenforceable as a penalty if it requires "payment of a sum of money grossly disproportionate to the amount of actual damages." Id. at 424; see also Clubb v. ANC Heating & Air Conditioning, Inc., 675 N.Y.S.2d 176 (N.Y. App. Ct. 1998) (penalty of $72,800 for actual loss of $1500 was "grossly disproportionate" to the loss and constituted a penalty). "In determining the enforceability of a liquidated damages clause, courts should consider 'the surrounding circumstances and the apprehension of damage that existed in the minds of the parties at the time the contract was made.'" LeRoy v. Sayers, 635 N.Y.S.2d 217, 222 (N.Y. App. Ct. 1995), quoting, 36 NY Jur. 2d, Damages 156, at 267). Significantly, "where there is doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause, it should be resolved in favor of a construction which holds the provision to be a penalty." Pyramid Centres and Co. Ltd. v. Kinney Shoe Corp, 663 N.Y.S.2d 711, 713 (App. Div. 1977) (internal citation omitted).

By Fingerhut's interpretation, it and Wal-Mart.com agreed in August 2000, that if Wal-Mart.com ceased using Fingerhut's services in August 2001, Wal-Mart.com would be in breach and Fingerhut would be entitled to $3.2 million in liquidated damages. As explained throughout this Trial Brief, Wal-Mart.com vigorously denies that it breached the Agreement. Wal-Mart.com was required to submit a new forecast and there were no restrictions on such forecast. The Agreement allowed for submission of forecasts of zero (0) goods after the first year, and Wal-Mart.com continued to perform, as demonstrated by payment of the monthly "Account Management Fee."

Even if Wal-Mart.com had breached, the sum is "grossly disproportionate" to any actual damages suffered by Fingerhut. Fingerhut has not submitted even a scintilla of evidence demonstrating how $3.2 million relates to its damages. In fact, what has been presented indicates that Fingerhut's actual damages were much lower. Fingerhut admits that most of its losses related to its relationship with Wal-Mart and Wal-Mart.com were labor-related. As for ramp-up costs such as hiring and training new personnel, Wal-Mart.com paid for those expenses when they occurred as part of the Agreement.

In fact, Fingerhut understood it would receive a windfall if Wal-Mart.com's orders were less than in the forecast attached to the Agreement. Michael Murray, Fingerhut's Senior Vice President of Operations, explained as much in an August 14, 2000 memorandum, "[o]bviously, we have some upside if Wal-Mart falls short of their forecast, and we reduce staff, yet collect minimum fees."

As evidence of his understanding, Murray attached to his memorandum, a comparison of costs based on different volumes over a one year period. The figures in this comparison were based on the forecast attached to the Agreement. Murray's analysis shows $5.4 million in variable costs per year. (calculated by subtracting $1.8 million in postage costs from $7.2 million variable costs.) If this is divided in half (the six months Wal-Mart.com submitted a forecast of zero (0) goods), the result is $2.7 million in variable costs. If this number is subtracted from $3.2 million the result is $500,000. It is easy to see that Fingerhut is claiming entitlement to a $2.7 million windfall, since these costs would not be incurred if no packages were processed. Fingerhut's actual damages

were more like $500,000.00, not $3.2 million. The amount it seeks is a penalty, unenforceable under New York law.

Under New York law, the question whether a contract damages provision imposes a penalty is a question of law for the court, not the jury. See Rattigan v. Commodore Int'l, Ltd., 739 F.Supp. 167, 169 (SDNY 1990). The question of whether the provision imposes a penalty is to be judged as of the time the contract was entered. See Id.

In a case with very similar facts, Judge Posner of the Seventh Circuit held that a minimum provisions in a distribution agreement was a penalty and not liquidated damages. See Lake River Corp. v. Carborundum Co., 769 F.2d 1284 (7th Cir. 1985).

## CONCLUSION

Wal-Mart.com did not breach the Agreement. The Agreement required Wal-Mart to submit a new forecast for June 2001 through January 2002 in March 2001. The Agreement did not require any type of minimum volume forecast. Pursuant to the Agreement, Wal-Mart submitted a new forecast for June 2001 through January 2002 which forecast zero (0) packages shipped for the last six months of the Agreement.

The language of the Fulfillment Services Agreement cannot support Fingerhut's construction. Reading whole clauses out of the Agreement and giving words and phrases contorted, nonsensical meaning is not proper contract interpretation methodology. It is clear that the Agreement permitted Wal-Mart.com to submit a forecast of zero (0) packages for the period August 2001 through January 2002. Moreover, what is expressed

by the words of the Agreement is made certain by the evidence that all parties believed a new forecast would be submitted by Wal-Mart.com at the time the Agreement was signed.

Further, even if Wal-Mart.com breached the Agreement, which Wal-Mart.com vigorously denies, Fingerhut has improperly calculated its damages. Fingerhut is entitled only to its expected profit, not to the expected contract price.

The Court should deny the relief requested by Fingerhut.

Date: October 22, 2004 DORSEY & WHITNEY LLP

By s/Perry M. Wilson III
Perry M. Wilson III (#12302X)
Angela M. Hall (#0311066)
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600

Attorneys for Defendant Wal-Mart.com, Inc.