# FULFILLMENT SERVICES AGREEMENT

PARTIES: WAL*MART.COM, INC.
702 SW 8th
Bentonville, Arkansas
("Company")

FINGERHUT BUSINESS SERVICES, INC.
and its affiliates
4400 Baker Road
Minnetonka, Minnesota 55343
(collectively, "FBSI")

EFFECTIVE DATE: June 1, 2000

AGREEMENT:

In consideration of the mutual covenants and agreements contained herein, FBSI and Company agree as follows:

**Section 1. Services.**

(a) In support of its internet direct to consumer business, Company retains FBSI to perform and, subject to the terms and conditions of this Agreement and the Exhibits and Schedules attached hereto, FBSI agrees to provide, or cause its various affiliates (all of which are hereinafter collectively referred to as "FBSI") to provide, the fulfillment services in accordance with the timetable, all of which is more specifically set forth on the attached Schedule A (collectively referred to as the "Fulfillment Services"). FBSI shall be a provider of Fulfillment Services for Company with respect to its internet direct to consumer business for the duration of the Term (as that term is defined below).

(b) FBSI shall provide reporting to Company in the file formats and at the frequency as set forth in Schedule A. Company shall provide reports as are mutually agreed upon by the parties.

**Section 2. Compensation.**

(a) Company shall pay to FBSI a monthly account management fee ("Account Management Fee") at the rate set forth in Schedule A.

(b) Each month following the Effective Date, Company shall pay to FBSI a fee ("Services Fee") for all Fulfillment Services provided by FBSI (including the Minimum Services Fee) with respect to the preceding calendar month. The pricing of the Services Fee is set forth in Schedule A.

DEPOSITION EXHIBIT 1
PENGAD-Bayonne, N. J.

© 2000 Fingerhut Business Services, Inc.

CONFIDENTIAL
F 000414

EXHIBIT A

(c) Company shall pay for all postage and freight ("Postage") provided by FBSI in connection with the Fulfillment Services. The rates for Postage anticipated to apply to the performance of the Fulfillment Services are set forth in Schedule A.

(d) On an annual basis, FBSI may, upon thirty (30) days prior written notice to Company, increase any price for any Fulfillment Service, which increases shall not exceed ten percent (10%) of the current price for such Fulfillment Service. At any time, FBSI may, upon thirty (30) days prior notice to Company, increase the rates for Postage to reflect actual increases in Postage costs. If requested by Company, increases in Postage rates shall be substantiated in writing by FBSI.

Section 3. Payment Terms.

(a) Every month, FBSI shall invoice ("Monthly Invoice") Company for the following:

(i) the Account Management Fee for the immediately preceding calendar month; and

(ii) the Services Fee for all Fulfillment Services provided during the immediately preceding calendar month, including any Minimum Services Fee as set forth in Schedule A.

The Monthly Invoice shall detail the Fulfillment Services provided and the corresponding Services Fees and shall be sent to Company within three (3) business days of the date of the Monthly Invoice. Within thirty (30) days of the Monthly Invoice, Company shall pay each such invoice by check or wire transfer of immediately available funds pursuant to wire instructions provided by FBSI to Company. FBSI shall assess, and Company shall pay, interest at a rate of one and one-half percent (1½%) per month on all invoiced amounts which are not paid within forty-five (45) days of the date of the Monthly Invoice. Interest will start accruing on the thirty-first (31st) day from the date of such invoice, and will accrue until all overdue payments, plus interest charges, are paid in full.

(b) Upon execution of this Agreement, Company shall pay to FBSI an amount equal to the estimated weekly Postage for deposit in a Postage account with FBSI. FBSI shall withdraw amounts from this account for payment of Postage provided on behalf of Company. Each week, FBSI shall provide an invoice to Company for the Postage provided during the immediately preceding one-week period. In the event the balance in the Postage account becomes insufficient to cover the weekly Postage provided on behalf of Company, FBSI may invoice Company for such additional amount necessary to replenish the Postage account. Within five (5) business days of receipt of such invoice, Company shall pay all amounts in each such invoice by check, or by wire transfer pursuant to wire instructions provided by FBSI to Company and FBSI shall deposit such payments into the Postage account. FBSI shall assess, and Company shall pay, interest at a rate of one and one-half percent (1½%) per month on all invoiced amounts for Postage which are not paid within ten (10) days of the date of the invoice. Interest will start accruing on the fifth (5th) day from the date of such invoice and will accrue until all overdue payments, plus interest charges, are paid in full.



CONFIDENTIAL
F 000415

(c) Company and FBSI shall use their best efforts to expediently resolve any disputed amount on an invoice; provided, however, that all amounts on an invoice which are not disputed shall be due and payable in accordance with Subsections (a) and (b) above. In the event Company and FBSI cannot resolve a disputed amount on an invoice through negotiations within thirty-five (35) days of the date of such invoice, Company shall deposit the disputed amount in an escrow account and the parties shall resolve the dispute in accordance with Section 16 below.

(d) FBSI shall have the right to cease providing Fulfillment Services until payment is received on past due invoices.

Section 4. **Company Business Plan.**

(a) As of the date hereof, Company represents that it desires to conduct its internet direct to consumer business in accordance with the specifications set forth on Schedule B attached hereto ("Company Business Plan"). Company acknowledges and understands that the terms contained within Schedule A are contingent upon the Company Business Plan.

(b) From time to time during the Term (as that term is defined below) of this Agreement, Company may desire to change the Company Business Plan. Any such request shall be submitted in writing to FBSI along with a revised Company Business Plan. In the event the actual results of Company's direct to consumer business are different than the terms contained in the Company Business Plan, the Company Business Plan shall be deemed revised consistent with such actual results. Within five (5) business days of receipt of a request and revised Company Business Plan from Company or upon a change to the Company Business Plan due to actual results, FBSI shall submit to Company, in writing, a revised Schedule A resulting from the change to the Company Business Plan. Company must accept or reject such revised Schedule A within five (5) business days of receipt. FBSI shall not be responsible for implementing any changes to the Schedule A or Fulfillment Services until the parties have agreed upon a revised Schedule A. Notwithstanding the foregoing, Company shall not request any changes in the Company Business Plan, and FBSI shall not be required to make any changes in Schedule A or the Fulfillment Services, which involve or in any way relate to FBSI system codes at anytime during the three month period commencing October 15 and ending January 15 during the Term.

(c) Notwithstanding Company's obligation to submit a request for any modifications to the Company Business Plan or the parties' respective obligations to agree upon a revised Schedule A, any actual results in Company's direct to consumer business which differ from the Company Business Plan shall automatically result in a revision to Schedule A commensurate with the type and at the time of such differing results.



CONFIDENTIAL
F 000416

Section 5. **Term and Termination.**

(a) The term of this Agreement shall commence as of the Effective Date and shall continue until January 31, 2002 (the "Initial Term") and shall automatically renew for successive one (1) year terms thereafter (a "Renewal Term") unless terminated by either party not less than ninety (90) days prior to the expiration of the Initial Term or any Renewal Term or otherwise terminated earlier pursuant to the terms and conditions hereof. The Initial Term and Renewal Term are hereinafter collectively referred to as the "Term." Notwithstanding anything to the contrary contained herein, within thirty (30) days of the conclusion of the first (1st) year of the Initial Term of the Agreement, Company and FBSI shall meet and confer to discuss and evaluate the pricing of the Fulfillment Services and may mutually agree to increase or decrease such pricing for the remainder of the Initial Term depending on the parties' respective costs and circumstances at such time.

(b) If, at any time during the term of this Agreement, either party shall claim that the other has failed to perform or observe any material terms or conditions of this Agreement, the party claiming such failure shall give the other party written notice describing with particularity the claimed breach. If, with respect to any non-payment of invoiced amounts, within five (5) days or, with respect to all other breaches, within forty-five (45) days from such notice the claimed breach has not been cured, the complaining party may terminate this Agreement.

(c) Either party may terminate this Agreement immediately upon written notice to the other party in the event the other party voluntarily files, or has filed involuntarily against it, a petition under the United States Bankruptcy Code, including a petition for Chapter 11 reorganization as set forth in the United States Bankruptcy Code. In the event FBSI voluntarily files, or has filed involuntarily against it, a petition under the United States Bankruptcy Code, Company shall have the right to require FBSI to continue to provide the Fulfillment Services until Company has been able to secure an alternative provider.

(d) The rights of the parties to terminate this Agreement or any Schedule are not exclusive of any other rights and remedies available at law or in equity, and such rights shall be cumulative. The exercise of any such right or remedy shall not preclude the exercise of any other rights and remedies.

(e) Notwithstanding any expiration or termination by either party of this Agreement, FBSI shall continue to fulfill all orders from customers, and Company shall continue to remit amounts due to FBSI under this Agreement, in connection with any product orders made prior to the effective date of such termination. All Fulfillment Services furnished after the expiration or termination of this Agreement shall continued to be governed by the provisions of this Agreement. Upon expiration or termination of this Agreement, all amounts invoiced by FBSI to Company hereunder shall become immediately due payable.

Within five (5) business days following the delivery of notice of termination or expiration of this Agreement, FBSI shall prepare an estimation of the cost for the liquidation services (as more specifically defined in Schedule A) and provide such estimation to Company. Within three (3) business days following receipt of the estimation of the cost for the liquidation services, Company shall pre-pay to FBSI such estimated cost. Following such prepayment, FBSI shall commence with the necessary liquidation services. Upon completion of the liquidation services, FBSI shall invoice Company for the actual costs to perform the liquidation services and deduct the prepayment made by Company. In the event the estimated cost for the liquidation services exceeds the actual liquidation cost, FBSI shall refund any overpayment of the liquidation cost made by Company. This provision shall survive the termination of this Agreement.

Section 6. Account Management.

Each party shall designate one of its employees ("Account Manager") to serve as the contact with the other party, and shall provide to the other, in writing, the name, title, address, telephone and fax numbers, and e-mail address of its Account Manager. The Account Manager designated by Company shall be authorized to make all decisions concerning the day-to-day operations relating to the Company Business Plan and the provision of Fulfillment Services. The Account Manager designated by FBSI shall be experienced in the provision of Fulfillment Services and shall be responsible for all communications with Company concerning the day to day operations of the Fulfillment Services. Each Account Manager will use its best efforts to resolve each issue on the parties' list of outstanding issues (the "Issue List") within twelve (12) hours after the parties have placed such issue on the Issue List and each Account Manager has been notified of the issue in writing.

Section 7. Books and Records.

(a) Both parties agree to keep complete and accurate books of account, records, and other documents with respect to the Fulfillment Services provided hereunder ("Books and Records"). Such Books and Records shall be kept by both parties for three (3) years following expiration or termination of the Agreement.

(b) The Books and Records shall be available for inspection and copying by any qualified representative or agent of a party or its affiliates, at the expense of that party, subject to the following terms and conditions: (i) such examination shall take place at the location where the Books and Records are regularly maintained, during normal business hours and only to the extent necessary to verify inventory levels, payment amounts, and compliance with laws relating this Agreement; (ii) the party demanding the audit shall give the other party at least seven (7) business days' written notice prior to any such examination; and (iii) a party may not conduct more than three (3) such inspections during any twelve-month period during the term of this Agreement.

Section 8. Tax Matters.

CONFIDENTIAL
F 000418

Company acknowledges that it is solely responsible for identifying and resolving sales and use tax collection issues for product orders, including the necessity of charging and collecting such taxes. FBSI agrees to (i) make available its records which relate directly to sales and use taxes to Company upon written request, and to promptly forward to Company notice of any dispute related to Company's taxes; and (ii) separately state on all consumer invoices state and local sales taxes charged to the consumer.

Section 9. **License.**

(a) Company hereby grants to FBSI a limited, revocable, non-exclusive license to use the trademarks, logos, or artwork owned or licensed to Company and identified in the Company Business Plan (collectively referred to as the "Licensed Marks") for the purpose of rendering Fulfillment Services. Other than as contemplated by this Agreement or any Schedule, FBSI may not make any other use of the Licensed Marks or any related marks or intellectual property of Company.

(b) Company hereby represents and warrants to FBSI that it is authorized to grant the aforementioned license and shall fully indemnify and hold FBSI and its affiliates harmless against any and all claims by a third party alleging a violation of such third party's intellectual property or other proprietary rights in connection with FBSI's use of the Licensed Marks pursuant to this Agreement or any Schedule. The indemnification granted under this Section expressly includes indemnification with respect to reasonable attorneys fees and any and all expenses or costs incurred or amounts paid in settlement or in satisfaction of any judgment or award.

Section 10. **Relationship of the Parties.**

(a) The relationship created hereunder between FBSI and Company shall be solely that of independent contractors entering into an agreement. Neither party shall make any representations or assertions or take any actions which could imply or establish any agency, joint venture, partnership, employment or trust relationship between Company and FBSI with respect to the subject matter of this Agreement and any Schedule. FBSI and Company shall not have any authority or power whatsoever to enter into any agreement, contract or commitment on behalf of the other, or to create any liability or obligation whatsoever on behalf of the other, to any person or entity.

(b) FBSI may subcontract with other individuals and businesses for Fulfillment Services required to be performed pursuant to this Agreement or any Schedule, subject to the prior written consent of Company, which consent shall not be unreasonably withheld. FBSI shall be responsible for all payments to, as well as the direction and control of the work to be performed by its subcontractors, if any, pursuant to this Agreement and any Schedule.

Section 11. **Inventory, Facilities and Risk of Loss**

(a) Company shall provide FBSI with sufficient inventory (the "Inventory") to allow FBSI to perform the Fulfillment Services. FBSI shall have no liability to Company or



CONFIDENTIAL
F 000419

third parties for losses caused directly or indirectly by Company's failure to provide sufficient inventory. The Inventory shall consist of the types of Products with the product characteristics identified on Schedule B attached hereto. Company warrants that the Inventory shall not include any hazardous, controlled, or regulated substances or that any of the Inventory is subject to expiration other than those Products so identified in writing to FBSI by Company. Company shall not ship or cause any other entity to ship any Inventory to FBSI unless it is prepaid and until SKU set up and purchase orders have been completed. FBSI reserves the right to reject any shipment of Inventory which does not comply with the specifications set forth in this Section, Schedule A, or Schedule B.

(b) FBSI acknowledges that Company retains all right and title to all Inventory and packaging materials which Company causes to be delivered to FBSI under this Agreement. Company reserves the right to, upon five (5) business days' written notice, to physically inspect the Inventory in FBSI's possession and control. Requests for inspection of Inventory shall not be made more than five (5) times during any twelve (12) month period. Any removal of Inventory is subject to the payment of the Services Fee for liquidation set forth in Schedule A.

(c) Subject to Subsection 11(d) below, FBSI shall be responsible for all risk of direct physical loss for the Inventory while it is in the possession or control of FBSI. Company waives its rights to recover damages from FBSI relating to loss of use of the Inventory arising out of any such damage, and/or loss of income therefrom arising out of such damage, except to the extent FBSI has agreed to indemnify Company pursuant to Section 9(a). Company shall maintain the same levels of insurance coverage on the Inventory as it maintains with respect to its inventory in its warehouse(s). Company shall be responsible for the administration of all claims against carriers relating to Products damaged in shipment to FBSI's facilities and/or in shipment to Company's customers.

(d) Company and FBSI shall mutually develop a quarterly inventory cycle count (by product unit) program. The year-end inventory accuracy standard shall be 99% of FBSI book inventory of product units according to FBSI's Books and Records. The year-end inventory accuracy standard shall be the total unaccounted missing Company product units within FBSI's facilities as a percentage of the total Company product units received by FBSI during the respective year. To the extent the inventory accuracy is 98% or greater of FBSI book inventory of product units, Company shall be responsible for such portion of the inventory adjustment. To the extent the inventory accuracy has been maintained between 97% and 99% of FBSI book inventory of product units, the cost of such portion of the inventory discrepancy shall be shared equally by both parties, in which case, FBSI shall reimburse Company at cost, for one-half of the inventory adjustment between 97% and 99%. To the extent the inventory accuracy is less than 97% of FBSI book inventory of product units, FBSI shall reimburse Company, at cost, for that portion of the inventory adjustment under 97%. Company will report monthly, to FBSI, Company's product costs and inventory value based upon the cycle counts completed by FBSI. Company shall maintain the necessary Books and Records for the product costs and inventory value. Both parties will manage and report compliance issues monthly. Notwithstanding anything to the contrary contained herein, this Section shall govern all



CONFIDENTIAL
F 000420

issues relating to inventory shrinkage; provided, however, FBSI shall reimburse Company for the cost of all Products which are damaged solely by FBSI or stolen by FBSI employees and such Products shall not be included in the inventory shrinkage calculation set forth above.

(e) Under FBSI's cycle count process, FBSI will physically count, on a quarterly, bi-annual or annual basis depending on the applicable Company Product SKU's classification, all on-hand locations in FBSI's distribution center for a particular Company Product SKU. All activity for such Company Product SKU is frozen during the cycle count for the Product SKU. At or about the time of SKU set-up, FBSI shall classify each Company Product SKU with an A, B, or C classification based on the SKU's dollar amount value and quantity of demand. Company will assist FBSI with the determination of the value and demand for each Product SKU. Each Company Product SKU with an "A" classification will be counted once each quarter, a "B" classification will be counted once every six months, and a "C" classification will be counted once each 12-month period. During the term of this Agreement, FBSI will develop cycle count plans on a quarterly basis for those Company Product SKUs to be counted in the following three months.

**Section 12. Year 2000 Representation.**

(a) Each party represents and warrants that their respective facilities and equipment utilized in connection with the Fulfillment Services have been designed or will be modified to ensure continuous operation and use prior to, during and after the calendar year 2000, and to operate during such time periods so that neither Company nor Fingerhut will experience any loss of information or assets, interruption in service, invalid and/or incorrect reporting or results.

(b) The representation and warranty under this Section shall survive the termination of this Agreement.

**Section 13. Indemnification.**

(a) Subject to the limitations specified in this Section, FBSI shall indemnify, hold harmless and defend Company and each person or entity that is a stockholder, officer, director, partner, employee, affiliate or agent of Company from and against any and all losses, claims, damages, liabilities, whether joint or several, expenses (including reasonable legal fees and expenses), judgments, fines and other amounts paid in settlement, incurred or suffered by any person (excluding Company employees) or entity arising out of or in connection with (i) the inaccuracy of any representation or warranty made by FBSI hereunder, (ii) any breach of this Agreement by FBSI, or (iii) any negligent act or omission by FBSI or its employees or agents in connection with the performance by FBSI or its employees or agents of the Fulfillment Services hereunder, provided such negligent act or omission was not done or omitted at the direction of Company.



CONFIDENTIAL
F 000421

(b) Subject to the limitations specified in this Section, Company shall indemnify, hold harmless and defend FBSI and each person or entity that is a stockholder, officer, director, partner, employee, affiliate or agent of FBSI from and against any and all losses, claims, damages, liabilities, whether joint or several, expenses (including reasonable legal fees and expenses), judgments, fines and other amounts paid in settlement, incurred, or suffered by any person or entity arising out of or in connection with (i) the inaccuracy of any representation or warranty made by Company hereunder, (ii) any breach of this Agreement by Company, (iii) any negligent act or omission by Company or its employees or agents in connection with the performance hereunder provided such negligent act or omission was not done or omitted at the direction of FBSI, or (iv) any claim or action for personal injury, death, property damage or other cause of action (A) involving a product liability claim arising from or relating to products for which Fulfillment Services are provided to Company hereunder, (B) resulting from defects or the inherently dangerous nature of Company's products that are the subject of this Agreement; or (C) asserted by an employee of Company.

(c) If the indemnified party receives any notice of a potential claim or action for which it is entitled to indemnification from the indemnifying party, the indemnified party shall notify and furnish to the indemnifying party a copy of the action served or the claim or any other papers received by the indemnified party in connection therewith. The failure to give such notice shall not affect the indemnified party's ability to seek indemnification or reimbursement unless such failure has materially and adversely affected the indemnifying party's ability to defend the claim. If requested by the indemnified party, the indemnifying party shall defend any such action or proceeding, employing counsel selected by the indemnifying party with the approval of the indemnified party, and the indemnifying party and its counsel shall (i) consult with the indemnified party and keep the indemnified party fully advised of all proceedings, (ii) make no admissions or otherwise act in a manner which might be prejudicial to the indemnified party's rights; and (iii) neither settle nor discuss settlement without the indemnified party's prior approval, which approval shall not be unreasonably withheld.

**Section 14. Insurance.**

(a) During the term of this Agreement, FBSI will maintain, with a financially sound insurance company having an A.M. Best rating of A or better, the following insurance coverage:

(i) commercial general liability insurance with a combined single limit of $2 million per occurrence for bodily injury, including death and property damage;

(ii) worker's compensation, occupational disease, employer's liability with limits of not less than $500,000 per accident for bodily injury and $500,000 per employee for bodily injury by disease, disability benefit and similar employee benefit insurance required under the laws of the states where FBSI will perform the Fulfillment Services;

(iii) FBSI will furnish to Company certificates of insurance evidencing this coverage upon written request.

(b) During the term of this Agreement, Company shall maintain, with a financially sound insurance company having an A.M. Best rating of A or better, the following insurance coverage:

(i) commercial general liability insurance with a combined single limit of $2 million per occurrence for property damage and bodily injury including death;

(ii) Company will furnish to FBSI certificates of insurance evidencing this coverage upon written request.

**Section 15. Limitations on Liability.**

(a) EXCEPT AS TO CLAIMS FOR INDEMNIFICATION, IN NO EVENT SHALL EITHER PARTY'S LIABILITY HEREUNDER INCLUDE ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL LOSSES OR DAMAGES, EVEN IF SUCH PARTY SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH POTENTIAL LOSS OR DAMAGE.

(b) Each of the parties hereto shall be liable to the other for damages arising out of or in connection with any negligent act or breach of this Agreement or any Schedule by such party to the extent permitted by law, subject to the duty of the non-breaching party to take all reasonable actions in order to mitigate such damages; provided, however, that (i) FBSI's liability for any Fulfillment Services provided hereunder shall be limited to the recovery by Company of the amount actually paid to FBSI by Company for such Fulfillment Services and (ii) FBSI's total liability hereunder shall be limited to the aggregate amount actually paid by Company to FBSI for Fulfillment Services.

**Section 16. Dispute Resolution.**

If there is any controversy, dispute or claim arising out of or relating to interpretation or breach of this Agreement, the parties will endeavor to settle it promptly.

**Section 17. Laws and Regulations.**

(a) FBSI shall comply with all laws, ordinances, rules and regulations, whether federal, state or local, applicable to the provision of the Fulfillment Services. FBSI shall at all times conduct its business in a reputable and ethical manner and in accordance with recognized standards of its business.

(b) Company shall comply with all laws, ordinances, rules and regulations, whether federal, state or local, applicable to its business, including, but not limited to, all special labeling requirements related to the shipment of Products to consumers, all FTC customer notice requirements, and all Mail Order Rule requirements. Company agrees to procure and maintain, at its sole expense, all permits and licenses necessary for its direct to consumer business, including any licenses or permits related to the shipment of Products to consumers by FBSI. All Products offered for sale by Company shall be in compliance

with all federal, state and local laws, ordinances, rules and regulations. While on FBSI premises, Company shall comply with the security policies and all rules and regulations promulgated by FBSI. Company shall at all times conduct its business in a reputable and ethical manner and in accordance with recognized standards of its business.

(c) Each party agrees to promptly provide to the other copies of all complaints or inquiries received by it from any governmental agency that in any way relate to or have a potential effect on the Fulfillment Services provided hereunder. In the event FBSI is required, as a result of any such action, to change the manner in which it does business in any material respect, FBSI shall have the option to terminate as soon as practicable the availability of such Fulfillment Services hereunder.

(d) The provisions of this Section shall survive the termination of this Agreement and any Schedule.

Section 18. Marketing Materials.

During the Term, both parties agree to act as a general reference for the other in regard to the subject matter of this Agreement and that either party may disclose the existence of the relationship between Company and FBSI (excluding specific terms and conditions contained herein or any Confidential Information (as that term is defined below)) to third parties. The written consent of the other party shall be obtained before that party is used as a reference in any particular instance. Company or FBSI may issue press releases consistent with this Section; provided, however, each party shall first obtain the approval from the other party prior to issuing a press release. FBSI agrees not to use Company's marks in any publicly distributed marketing materials without prior written consent.

Section 19. Confidentiality.

(a) For purposes of this Agreement, "Confidential Information" means any information or compilation of information concerning the business of a party which is provided, whether oral or written, to the other party and includes, without limitation, the terms of this Agreement, trade secrets, inventions, or information pertaining to development, merchandising, marketing, sales, accounting or licensing of a business' products or services, customer and supplier information, processes and systems, working papers, correspondence, and all financial information. Information which is identified as being "confidential", a "trade secret", or is identified or marked with any similar reference shall be presumed to be Confidential Information. Confidential Information shall not include any information which (i) was received in good faith by the receiving party from any third party without breach of any obligations of confidentiality; (ii) was independently developed (without access to or use of any Confidential Information of the other party) by an employee or agent of the receiving party; or (iii) is or becomes publicly available in a manner other than through an unauthorized disclosure.

(b) Company and FBSI agree and covenant with respect to all Confidential Information of the other received or learned by either of them as follows: (i) it will treat as

confidential all Confidential Information made available to it or any of its affiliates, employees, agents or representatives and shall be responsible for any breach of this Agreement by any of its affiliates, employees, agents or representatives; (ii) it will maintain all Confidential Information made available to it in a secure place and limit access to the Confidential Information to those employees, agents and representatives to whom it is necessary to disclose the Confidential Information in furtherance of this Agreement; (iii) it and its employees, agents and representatives will not disclose any Confidential Information to any unauthorized party or use any Confidential Information for any purposes not directly related to this Agreement; (iv) it shall not, directly or indirectly, exploit any Confidential Information for its own commercial gain in competition with the other party; (v) upon written request from the other party or upon termination of this Agreement, the receiving party shall return or destroy all Confidential Information furnished by the other party to it, except to the extent such Confidential Information is needed by the receiving party in connection with its post termination obligations set forth above, in which case such Confidential Information shall be returned or destroyed immediately upon the receiving party's fulfillment of such obligations; and (vi) notify the other party immediately in the event of an unauthorized disclosure or loss of any Confidential Information.

(c) The terms of this Section shall survive the termination of this Agreement.

**Section 20. Employees.**

The parties agree, that without the prior permission of the other, neither party will solicit for hire any current or former employees of the other during the Term, and for six (6) months thereafter, to perform services substantially similar to those performed on behalf of the former employer. This provision shall not restrict the right of either party to solicit or recruit generally in the media, and shall not prohibit either party from hiring an employee of the other party who solely answers an advertisement for employment, responds to inquiries from a employment search firm, or who otherwise voluntarily applies for hire without having been initially personally solicited or recruited by the hiring party.

**Section 21. Miscellaneous Provisions.**

(a) All notices, demands, requests, approvals, consents or other communications to be given or delivered under this Agreement ("Notices") will be in writing and will be deemed to have been given (1) when delivered in person or by courier, confirmed facsimile, or confirmed e-mail; (2) upon confirmation of receipt when sent by certified mail, return receipt requested or by facsimile; or (3) five (5) days after deposit in first class U.S. mail, as the case may be, to the addresses indicated below:

If to FBSI:

FBSI Business Services, Inc.
4400 Baker Road
Minnetonka, Minnesota 55343
Attention: Vice President of Sales
Facsimile: (612) 936-5106
E-mail: gina.grothe@fingerhut.com

With a copy to: Fingerhut Companies, Inc.
4400 Baker Road
Minnetonka, Minnesota 55343
Attention: General Counsel

If to Company:

WAL*MART.COM, INC.
702 SW 8th
Bentonville, Arkansas
Attention: _______________
Facsimile: _______________
E-mail: _________________

or to such other addresses as a party may designate from time to time by written notice to the other party.

(b) Whenever possible, each provision of this Agreement and any Schedule shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement or any Schedule is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement and any Schedule.

(c) This Agreement and any Schedule may be amended, and any provision of this Agreement and any Schedule may be waived; provided that any such amendment or waiver will be binding upon any party hereto only if such amendment or waiver is set forth in a writing executed by such party. No course of dealing between or among any persons having any interest in this Agreement and any Schedule will be deemed effective to modify or amend any part of this Agreement and any Schedule or any rights or obligations of any person under or by reason of this Agreement or any Schedule. The waiver of any default, or the remedying of any default in any manner, shall not operate as a waiver of any other prior or subsequent default. No extension of time for the performance of any obligation or act shall be deemed to be an extension of time for the performance of any other obligation or act hereunder. No delay or omission by a party to

exercise rights hereunder shall impair any such rights or shall be construed to be a waiver of any such default or any acquiescence therein.

(d) This Agreement, all Schedules, and exhibits hereto, contain the complete agreement between the parties relating to the Fulfillment Services and supersede any prior understandings, agreements or representations by or between the parties, written or oral, which may be related to the subject matter hereof in any way, including the Fulfillment Services Agreement between Company and FBSI dated May 31, 1999, which Agreement shall terminate as of the day immediately prior to the Effective Date. If there is a conflict between the terms of Schedule A and this Agreement, the terms of the Schedule shall control.

(e) Company and FBSI will each execute such other documents and take such actions as the other may reasonably request in order to effect the relationships, services and activities contemplated by this Agreement and any Schedule and to account for and document those activities.

(f) Section headings contained in this Agreement and any Schedule are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement and any Schedule, respectively, or any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.

(g) The internal law, and not the law of conflicts, of the State of New York will govern all questions concerning the construction, validity and interpretation of this Agreement and any Schedule and the performance of the obligations imposed by this Agreement and any Schedule.

(h) This Agreement and any Schedule and all of the provisions will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, except that neither this Agreement and any Schedule nor any of the rights, interest or obligations may be assigned by any party hereto without the prior written consent of the other party hereto. Notwithstanding the foregoing, either party may, with thirty (30) days written notice, but without the prior written consent of the other party, to assign or otherwise transfer its rights and obligations under this Agreement and any Schedule to any affiliated company.

(i) Each party acknowledges it has participated in the negotiation and preparation of this Agreement, and has reviewed this Agreement and had the opportunity to consult with its counsel and accountants with respect to its terms. Therefore, each party agrees that the rule of construction to the effect that any ambiguities in a document shall be interpreted against the drafting party, will not be utilized in the interpretation, construction, or enforcement of this Agreement, and no consideration shall be given to the issue of which party hereto actually prepared, drafted or requested any term or condition of this Agreement or any schedule or other instrument subject hereto.

(j) Neither party shall be liable for any failure of or delay in the performance of this Agreement or any Schedule for the period that such failure or delay is due to acts of God, public enemy, war, strikes or labor disputes, or any other cause beyond the parties' reasonable control (each a "Force Majeure"), it being understood that lack of financial resources shall not to be deemed a cause beyond a party's control. Each party shall notify the other party promptly of the occurrence of any Force Majeure and carry out this Agreement and any Schedule as promptly as practicable after such Force Majeure is terminated. The existence of any Force Majeure shall not extend the term of this Agreement or any Schedule.

(k) This Agreement may be signed in any number of counterparts.

FINGERHUT BUSINESS SERVICES, INC.

By ______________________
John D. Buck
President

Date 8-7-00

WAL*MART.COM, INC.

By ______________________
Print Name John Rittenhouse
Print Title Chief Logistics Officer
Date 8/3/00



CONFIDENTIAL
F 000428

# SCHEDULE A
# DESCRIPTION OF FULFILLMENT SERVICES

This Schedule describes the services to be provided by FBSI to Company from FBSI's distribution centers and the associated fees therefor.

## FULFILLMENT SERVICES

### Setup

Division Setup:

- Fingerhut Logistics Systems (FLS) provides integrated systems and interfaces to support fulfillment functions. These systems include:
  - Product Management - Processes to set up and track all products and their associated attributes
  - Inventory Control - Processes to track inventory within the distribution center
  - Order Management – Processes to prepare an order for shipment
  - Distribution Management – Processes to efficiently ship the orders
- FBSI has setup Company as a distinct division within FLS.
- FBSI has setup Company as a distinct division in Corporate Inventory System to facilitate the maintenance and reporting of Company's inventory in FBSI's distribution centers.
- FBSI will provide the setup and maintenance of Company's product information into FBSI's Merchandise Management System (MMS). Company will provide all product information to FBSI.
  - Company will provide all current and future product information, both active and discontinued, as and when requested by FBSI.
  - FBSI will set up all products (current and ongoing) in MMS using the product information provided by Company in accordance herewith.
  - FBSI will flag any product identified as discontinued by Company in MMS.

  The standard setup includes the setup of 10,000 product code/color combinations.

### Fees

Division Setup:

- The fee for the IS programming necessary for standard setup of Company into the FLS system, including setup of 10,000 product code/color combinations, has been paid by Company.
- The fee for additional product code/color combinations to be set up is $2.00 per each product code/color combination; provided, however, upon automation of product code/color combination set up, the parties shall meet and negotiate this charge.
- Additional custom IS programming will be handled as a Special Work Request.

CONFIDENTIAL
F 000429

© 2000 Fingerhut Business Services, Inc.

## Order Management Services

Order Management

- All web-based orders will be received by FBSI from Company through a file transfer (download) into FLS and then transferred to the FBSI distribution center in accordance with FBSI's standard order processing schedule.
- Shipment destinations will be United States. A limited number of International shipments may be accepted as a Special Work Request.
- All credit card authorizations will be completed by Company prior to transferring the order to FLS.
- Prior to processing, all Company orders will be verified by Code/1 address verification software. Rejected orders, due to invalid ship-to address, or source/segment discrepancies will be serviced by FBSI to confirm the ship-to address.

Customer Service

- FBSI will provide limited customer service to Company from 7:00am to 7:00pm CST, Monday through Friday, (excluding FBSI recognized holidays) to manage special order situations. These include, but are not limited to:
  - Support to Company for its resolution of claims against carriers
  - Package tracing
  - Order modification
  - Order cancellation
  - Special ship orders
  - Researching and looking up orders

## Fees

Order Management Fees:

- Rejected orders are rectified and re-entered at $.50 per rejected order.

Customer Service Fees:

- Use of FBSI customer service staff during regularly scheduled working hours to complete such special order situations will be billed at $.62 per minute used.
- All other FBSI staff necessary to complete such special order situations shall be billed at the hourly rates set forth in Special Work Requests.

## Distribution Processing Services

Distribution Processing

Distribution Processing includes the following operational activities:

- Receipt of Company purchase orders into FLS as an 850 EDI transmission or other communication form as agreed to by FBSI and Company.
- Receipt and verification of inbound product against the Company preliminary notification containing product code, SKU, description and quantity.
- If Company has complied with its obligations hereunder, merchandise is received in accordance with FBSI's standard receiving protocol, actual receiving volumes are within 10% of the receiving forecast provided by

## Fees

Product Storage Fees:

- Product storage dedicated to Company's merchandise will be billed by type of storage:
  - Bin Use or Case Position - $.18 per cubic foot per month (Based on Company's current product mix, a case is estimated to be 10 cubic feet and will be billed accordingly, any change in Company's product mix will result in a revised



CONFIDENTIAL
F 000430

Company, daily receiving volumes do not exceed 23% of the weekly receiving forecasts, and subject to Schedule B, on a monthly basis, FBSI will, within 48 hours (on business days) of receipt of a shipment of merchandise and the corresponding purchase order documentation,

- Complete the receipt of each Company purchase order;
- Complete limited quality control inspection of purchase order receipts including verification of item description and model number, and
- Make the received merchandise from the shipment available for picking.

- Processing of all receiving documentation including product overages, shortage, damage and quarantined items.
- Bin set-up for Company products.
- Inventory control operations to include monitoring of Company inventory, receiving into and relieving FLS, and cycle counting.
- FBSI will use best efforts to optimize all storage space utilization to minimize inventory space dedicated for Company products.
- Black and white invoice printing of customer orders with a single Company logo.
- Outbound order picking activities.
- Packing of outbound orders.
- Product gift wrapping and gift card insertion in accordance with FBSI standard gift wrap procedures.
- Black and white gift card printing.
- Manifesting and loading of customer orders for shipment.
- Providing storage space for Company products in FBSI's distribution centers.

<u>Support Activities</u>

- Receiving documents (i.e. packing slips, bills of lading) will be forwarded to Company on a weekly basis for documentation filing.
- Receiving problems will be identified to Company via e-mail.
- Report all inventory transactions to Company daily via electronic file transmission in the standard FBSI format.

<u>Packaging</u>

- Provide packaging materials necessary to successfully complete the fulfillment of Company customer orders.
- Company will provide marketing literature, gift boxes, wrapping paper, ribbons, stickers, and gift cards for designated customer orders.

estimation.)

- Pallet Position Use - $10.00 per pallet location per month

<u>Receiving Fees:</u>

- Receiving products and all associated documentation processing will be charged at $.85 per case at the time of receipt putaway of cases by FBSI.

<u>Package Fulfillment Fees:</u>

- Fulfillment fees are based on a package's ability to travel the conveyor system and Schedule B. Conveyable units will be billed at $3.32 per single unit package and $.88 per each additional unit in the package.
- Non-conveyable units will be billed at $3.29 per each such unit in a package.
- Packages requiring ORM-D handling will be billed an additional $.25 per such packages.
- Units requiring gift wrapping will be charged an additional $2.50 per unit wrapped.
- All supplies used to fulfill Company orders will be billed at FBSI cost plus 15%.

<u>Note: Company will be charged all Fulfillment Services Fees for test packages.</u>

CONFIDENTIAL
F 000431

Package Delivery

- Load and manifest for the shipment all Company packages processed in the distribution center.
- Company will be responsible for designating a ship method for each order in its order transmission file to FBSI. In the transmission file, Company may designate:
  - Normal – ship the package via the least cost method based on the size of the package.
  - UPS method
  - Express ship method - 2nd day express
  - Express ship method - Next day air
  - Other (or special shipments) – Company to communicate the ship method manually and FBSI to process the order manually.
- If the receiving and shipping forecasts are accurate within 10% of actual, sufficient inventory has been received in accordance with FBSI receiving protocol, actual daily shipping volumes do not exceed 23% of the weekly shipping forecasts, Company complies with its obligations hereunder, and subject to Schedule B, FBSI shall achieve the following monthly service levels:
  - All shipments will be fulfilled to a 99.5% accuracy level. In order to determine accuracy, on each business day, FBSI shall conduct a random audit of at least five percent (5%) of all packages prior to being sealed for delivery. The errors found during such audit will be recorded by type and the accuracy percentage will be calculated monthly based on the total packages processed during such month.
  - FBSI will use its best efforts to process and load on a trailer for shipment 98% of orders (which are accurate and shippable) by midnight of the next business day, but no later than by midnight of the second business day, after the order has been received by the FBSI distribution center in accordance with the FBSI order processing schedule.
  - In the event of an unexpected processing, equipment, systems, or facility failure or problem which prevents FBSI from processing orders in a timely fashion, the foregoing performance standard shall be suspended until such failure or problem is resolved.

Company Commitments

- Company will provide to FBSI at least two weeks prior to the beginning of each month its best, good faith estimate of weekly receiving and shipping volumes and SKU count for the following twelve months.
- Company will provide a good faith estimate of all sales

Postage:

- Company will be assessed a freight charge for each package shipped based on:
  - Package- weight
  - Method of shipment

  Such freight charges shall not include any mark-up.
- Rates assume that all packages fall within the maximum allowable length and girth dimension of 108". Additional charges will be applied to larger packages.
- For packages shipped UPS, FBSI will charge either FBSI's UPS rates or Company's UPS negotiated rates.
- These rates do not include insurance.

Assessments

- Each month ~~until the Maximum Daily Package Fulfillment Volume is achieved.~~ Company shall pay a prorata share of ~~T~~training costs incurred by FBSI. ~~Assessment in an amount equal to $480/week for each employee in training during the previous week as agreed upon by~~ FBSI and Company's on-site representatives at the end of each week shall agree on training costs to be paid and the actual length of the training to be undertaken for the following week. ~~The parties acknowledge that it takes approximately three (3) weeks of training for each newly hired distribution center employee who will be performing standard receiving, picking, and packing functions.~~

- Company shall pay an Overtime Assessment ~~for each day upon~~ based on the ~~which FBSI incurs~~



CONFIDENTIAL
F 000432

forecasting and inventory management support to FBSI to insure efficient order processing and instock levels.

- Company must comply with FBSI receiving protocol.
- Company will provide purchase orders that are accurate, complete, in the standard FBSI format, and shall not exceed 100 lines prior to receipt of products by FBSI.
- Upon FBSI's request, Company shall provide all Company information necessary to determine shipment accuracy.

Key Performance Indicator Targets
Company and FBSI will use their best efforts to work together and achieve the goals set forth in the Key Performance Indicator Target attachment attached hereto.

additional labor costs FBSI incurs as a result of scheduled overtime necessary for completion of the Fulfillment Services. FBSI and Company shall work together to minimize required overtime. The Overtime Assessment shall be an amount equal to Company's prorated portion of such total overtime hours multiplied by the overtime rates for the actual ~~applicable~~ hourly rates ~~set forth in Special Work Requests below~~. FBSI and Company's on site representative shall meet weekly to coordinate weekly volumes and staffing in an effort to minimize overtime costs.

- Company shall pay a Retention Assessment based on the total incentives FBSI must pay to its employees for retaining and maintaining a sufficient number of employees to complete Fulfillment Services during the period between the Thanksgiving and Christmas holidays. Prior to implementing retention incentive programs for which Company is required to pay a Retention Assessment, FBSI shall present such proposed program to Company for its review and comment. The Retention Assessment shall be an amount equal to Company's prorated portion of the total cost of such incentives paid by FBSI to its employees based on the number and type of packages shipped during the applicable period.

Reporting Services

Fees

CONFIDENTIAL
F 000433

Reporting Services

- FBSI will provide the following data ("FBSI Standard Reports") to Company:
  - Shipment files-Daily
  - Order Status files-Daily
  - Daily Inventory Transaction file
  - Weekly Inventory Balance file

Reporting Fees

- Transmission of the FBSI Standard Reports are included in the package fulfillment fees.
- Custom programming to create Company specific reporting will be billed at $125 per hour.

Special Work Requests Services

Special Work Requests Services

- In the event FBSI must or is requested to undertake work and/or special projects ("Special Work") that fall outside the normal day-to-day distribution processing activities of FBSI, Company must pay certain Special Work Request Fees. Special Work may result from a request by Company, or in the opinion of FBSI are required to successfully complete processing of orders as requested by Company. FBSI reserves the right to refuse to undertake any Special Work. Special Work Requests may include but are not limited to:
  - Special staffing requests
  - Telemarketing training
  - Distribution center training
  - Special manual ship processing
  - Special packaging
  - Purchase order adjustments
  - Kitting
  - Quality control activities such as ticketing or relabeling
  - Liquidation/transition/removal of inventory from FBSI distribution centers
  - Special reporting
  - Changes to FBSI system codes (excluding initial set-up)
  - Merchandising services
  - Data mining services
  - Overtime or work on non-business days by FBSI if requested by Company

  If Company desires that FBSI undertake any Special Work, Company must submit a written request to FBSI detailing the nature, specifications, and desired timetable for completion of such work. If FBSI is willing to undertake such work, FBSI will provide a written response ("Special Work Order") detailing the specifications and timetable under which it will complete

Fees

Special Work Request Fees:

- Office employees
  - Production-$16 per hour
  - Technical-$28 per hour
- Distribution employees
  - Production-$20 per hour
  - Technical-$28 per hour
  - Specialist-$28 per hour
- Supervisors
  - $40 per hour
- Information Systems employees
  - $125 per hour
- Merchandising and data mining Special Work will be billed at the hourly or project rates to be quoted in a Statement of Work.
- Any supplies to be used will be charged at cost plus 15%.



CONFIDENTIAL
F 000434

the Special Work and the estimated charges to be paid by Company for such work. If agreeable, Company must then execute the Special Work Order before commencement of the Special Work. In the event Special Work becomes necessary in order to complete order processing as requested by Company, FBSI will submit a Special Work Order to Company. If Company does not agree with the Special Work Order, FBSI may suspend or discontinue the Special Work until a Special Work Order for such work is accepted by Company.

## ACCOUNT MANAGEMENT SERVICES

Account Management

- FBSI and Company agree to conference weekly to review and resolve issues relating to the day to day operations. The agenda for these meetings will include forecasts, item set-up, PO set-up, receiving, order processing, fulfillment and shipping as topics to be discussed.
- It is understood that FBSI and Company will work together during program launch to monitor performance using existing FBSI and Company reports.

Account Management Fee:

- A minimum monthly fee of $7500 will be billed to cover the costs of Account Management. This fee includes the time devoted to your account by the assigned FBSI Account Manager, operational support and other support functions that may be required for standard day-to-day activities.
- Depending on the actual volume and the complexity of Company's ongoing direct-to-the-consumer business and actual use of account management services, the monthly Account Management Fee will be increased to:
  - $10,000 for a fulltime dedicated Account Manager
  - $17,500 for a fulltime dedicated Account Manager and a second part-time Account Manager
  - $20,000 for two fulltime Account Managers.

## MINIMUM SERVICES FEES

Minimum Services Fees:

- In accordance with the terms of the Agreement, Company shall pay a monthly Minimum Services Fee to FBSI during the Term.

Minimum Services Fees Payment:
Each month during the Term Company shall pay the greater of one of the following Minimum Services Fees:

- In the event the Package Shortfall



CONFIDENTIAL
F 000435

(as that term is defined below) for such month is greater than zero, Company shall pay to FBSI a monthly Minimum Services Fee in an amount equal to the Package Shortfall multiplied by the applicable Package Fulfillment Fee set forth above based on the actual average number of items per package shipped during the month (the "Package Fee"). The term "Package Shortfall" shall be an amount equal to the difference between the Minimum Package Count (as that term is defined below) and the actual number of packages shipped during the month. The Minimum Package Count shall be an amount equal to the number of Company SKUs in inventory as of the last Friday of the previous month multiplied by 3.5; or

- In the event the number of packages shipped in the month by FBSI for Company is less than the Forecast Package Volume (as that term is defined below), Company shall pay a Minimum Services Fee in an amount equal to the Minimum Packages (as that term is defined below) multiplied by the Package Fee (as that term is defined above). The term "Minimum Packages" shall be an amount equal to the difference between 75% of the Forecast Package Volume (as that term is defined below) and the actual number of packages shipped during the month. The term "Forecast Package Volume" shall mean the greater of the (a) number of packages estimated to be shipped as set forth in the monthly forecast submitted by Company to FBSI three (3) months immediately prior to the

commencement of the subject month or (b) the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company upon execution of this Agreement and attached hereto or (c) with respect to each year after the expiration of the first (1st) year, the number of packages estimated to be shipped in the subject month as set forth in the annual forecast submitted by Company in the month of March prior to commencement of the following one-year period under the Agreement.

## DISTRIBUTION CENTER BUSINESS DAYS

The business days and hours of operation at the Western Distribution Center in Spanish Fork, Utah, excluding WDC recognized holidays, are as follows: When working one shift, from 6:00am to 5:00pm MST Monday through Friday and, when working two shifts, from 6:00am to 2:15am MST, Monday through Friday. During peak, if shipment volumes warrant, the WDC hours may be extended and the number of business days increased. The WDC recognized holidays for the year 2000 are:

| | |
|---|---|
| New Years Day | Monday, January 3, 2000 |
| Presidents Day | Monday, February 21, 2000 |
| Memorial Day | Monday, May 29, 2000 |
| Day Before July 4 | Monday, July 3, 2000 |
| Independence Day | Tuesday, July 4, 2000 |
| Pioneer Day | Monday, July 24, 2000 |
| Labor Day | Monday, September 4, 2000 |
| Thanksgiving Day | Thursday, November 23, 2000 |
| Christmas Day | Monday, December 25, 2000 |
| Christmas Eve | Tuesday, December 26, 2000 |

The business days and hours of operation at the Tennessee Distribution, Inc. in Piney Flats, Tennessee, excluding TDI recognized holidays, are as follows: When working one shift, from 7:00am to 3:30pm MST Monday through Friday and, when working two shifts, from 7:00am to 12:30am EST, Monday through Friday. During peak, if shipment volumes warrant, the TDI hours may be extended and the number of business days increased. The TDI recognized holidays for the year 2000 are:

| | |
|---|---|
| New Years Day | Monday, January 3, 2000 |
| Martin Luther King Day | Monday, January 17, 2000 |
| Good Friday | Friday, April 21, 2000 |
| Memorial Day | Monday, May 29, 2000 |
| Independence Day | Tuesday, July 4, 2000 |
| Labor Day | Monday, September 4, 2000 |
| Thanksgiving Day | Thursday, November 23, 2000 |
| Christmas Day | Monday, December 25, 2000 |



CONFIDENTIAL
F 000437

| | |
|---|---|
| Christmas Eve | Tuesday, December 26, 2000 |
| New Year's Eve Day | Friday, December 29, 2000 |

The business days and hours of operation at the Fingerhut St. Cloud Warehouse in St. Cloud, Minnesota, excluding STC recognized holidays, are as follows: When working schedule no. one, from 5:00am to 4:15am CST Monday through Thursday, when working schedule no. two, from 5:00am to 4:15am CST, Tuesday through Friday, and when working schedule no. three, from 5:00am to 4:15am CST, on Monday, Tuesday, Wednesday, and Friday. During peak, if shipment volumes warrant, the STC hours may be extended and the number of business days increased. The STC recognized holidays for the year 2000 are:

| | |
|---|---|
| New Years Day | Monday, January 3, 2000 |
| Good Friday | Friday, April 21, 2000 |
| Memorial Day | Monday, May 29, 2000 |
| Day before July 4 | Monday, July 3, 2000 |
| Independence Day | Tuesday, July 4, 2000 |
| Labor Day | Monday, September 4, 2000 |
| Thanksgiving Day | Thursday, November 23, 2000 |
| Christmas Day | Monday, December 25, 2000 |
| Christmas Eve | Tuesday, December 26, 2000 |
| New Year's Eve Day | Friday, December 29, 2000 |
| New Year's Day | Monday, January 1, 2001 |

FBSI shall notify Company of the recognized holidays each calendar year thereafter.

Annual Forecast of Estimated Number of Parcels to be Shipped

| | |
|---|---|
| June | 13,750 |
| July | 11,000 |
| August | 11,000 |
| September | 20,000 |
| October | 100,000 |
| November | 405,000 |
| December | 490,000 |
| January | 32,000 |
| February | 32,000 |
| March | 40,000 |
| April | 32,000 |
| May | 32,000 |

Key Performance Indicator Targets

During the term of this Agreement, Company and FBSI will use their best efforts to work together and attempt to achieve the following key performance indicators ("KPIs") in connection with the Fulfillment Services:

1. Dock to Stock – Measured in daily increments, the goal will be 24 hrs. on business days for merchandise received in compliance with vendor guidelines and within the applicable forecast.
2. Inbound Discrepancy Reporting – Report will be issued by 5:00 CST each business day.
3. Re-work/Re-label – Measured in daily increments, the goal will be to process these within 24 hrs. on business days.
4. Receiving Accuracy – Audited on a 5% sampling basis, the goal will be to achieve 99% accuracy rate.
5. Shipping – Fill Rate – As currently reported, the goal will be to achieve a 99.8% fill rate for all labels received.
6. Shipping Accuracy – Audited on a 5% sampling basis, the goal will be to achieve a 99.5% accuracy rate.
7. Order Cycle Time –The goal will be to process 50% or more of standard orders and 100% of express orders received during a business day in time for the nightly batch run and processed by Midnight of the next business day. The goal will be to also process all orders within at least a 48-hour time frame with the ultimate goal of processing orders within 24 hours on business days.
8. Inventory Accuracy – Calculated on the basis of the pluses and minuses of inventory adjustments, the goal will be in the 98% range on an average basis.
9. Reporting – FBSI will provide the week to date version of the "Daily Report Card" for the prior week to Company by the close of business each Monday.
10. Customer Service Response – The goal will be for FBSI to review and respond to customer service inquiries within four (4) hours during customer service hours.

Both parties acknowledge and agree that these KPIs are goals or targets and do not constitute contractual obligations under the Agreement. As such, any failure to meet any KPI shall never constitute a breach under the Agreement. The parties shall meet and confer regarding these KPIs in an effort to achieve the KPIs together. The parties acknowledge that achievement of the KPIs is contingent on each party's performance and cooperation and a number of other factors, including, but not limited to, forecasts, information accuracy, staffing, order volumes, inventory levels, vendor compliance, systems capabilities, and consistent and clear communications.

SCHEDULE B
Company Business Plan

LICENSED MARKS

Wal*Mart
Wal*Mart.com

Products

Candy
Office supplies
Small electronics
Toys
Sporting goods
Hardware
Household cleaning supplies
Small electrical appliances
Seasonal decorations
Kitchen and bath accessories
Bedding
Shoes
Hoisery
Accessories
Ladies apparel and plus size/maternity wear
Ladies outerwear
Craft supplies
Optical
Impulse merchandise
Health and beauty aids
Household paper products
Cameras and supplies
Pet supplies and accessories
Automotive accessories
Painting accessories
Housewares and storage products
Home furnishings
Fabrics
Window dressings
Menswear and boys clothing
Infant and toddler
Sleepwear
Jewelry
Girls wear
Pharmacy
Cosmetics and skin care
Greeting cards, books and magazines
Balloons and flowers

Excluded Products

Controlled substances
Hazardous materials (other than materials which are only classified as ORM-D)
Guns/Firearms
Knives (w/blade >5 inches or overall length of >10 inches)
Tobacco
Alcoholic Beverages
Radar Detectors
Short term perishable food items
Tires or major automotive replacement parts
Major appliances
Paints or stains
Fertilizer
Any products which require special licensing or governmental permits or which require special shipment methods (other than ORM-D)

| | |
|---|---|
| Maximum Daily Pkg. Fulfillment Volume (as to all Pkgs in excess of such maximum volumes FBSI shall use its best efforts to ship such Pkgs. in accordance with the applicable performance standard) | For single unit packages<br>15,000 Pkgs.<br><br>For multi-unit packages-<br>Avg. # Units/Pkgs. — Max. Pkgs.<br>2 — 25,000<br>3 — 20,000<br>4 — 15,000<br>5 — 12,000<br>6 — 10,000<br><br>For both single and multi-unit pkgs-<br>Maximum of 25,000 packages |
| Maximum Growth in Weekly Package Fulfillment Volume | Each one week shipping volume forecast shall not (a) exceed the prior one week shipping volume forecast by more than 100% or (b) increase by more than 50,000 packages, whichever is less. |
| Average number of units per parcel | 1.77 units per parcel<br>2.7 units per multi-unit parcels only |
| Percentage of non-conveyable units shipped | 10% of total units |
| Maximum # of SKUs in inventory | 40,000 SKUs |
| Percentage of Case v. Pallet Receipts | 20% Pallets/80% Cases |
| Annual forecast | See attached forecast covering the period of June 2000-May 2001 |



CONFIDENTIAL
F 000442